JOHN G. GOESELE AND OTHERS, APPELLANTS, *v.* JOSEPH M. BIMELER AND OTHERS.

A society called Separatists, emigrated from Germany to the United States. They were very poor, and one of them, in 1817, purchased land in Ohio, for which he gave his bond, and took the title to himself. Afterwards, they adopted two constitutions, one in 1819, and one in 1824, which they signed, and in 1832 obtained an act of incorporation. The articles of association, or constitutions of 1819 and 1824, contained a renunciation of individual property.

The heirs of one of the members who signed these conditions, and died in 1827, cannot maintain a bill of partition.

From 1817 to 1819, the contract between the members and the person who purchased the property, vested in parol, and was destitute of a consideration. No legal rights were vested in the members.

The ancestor of these heirs renounced all right of individual property, when he signed the articles, and did so upon the consideration that the society would support him in sickness and in health; and this was deemed by him an adequate compensation for his labor and property, contributed to the common stock.

The principles of the association were, that land and other property were to be acquired by the members, but they were not to be vested with the fee of the land. Hence, at the death of one of them, no right of property descended to his heirs.

There is no legal objection to such a partnership; nor can it be considered a forfeiture of individual rights for the community to succeed to his share, because it was a matter of voluntary contract.

Nor do the articles of association constitute a perpetuity. The society exists at the will of its members, a majority of whom may at any time order a sale of the property, and break up the association.

The evidence shows that they are a moral, religious, and industrious people.

THIS was an appeal from the Circuit Court of the United States for the District of Ohio, sitting as a Court of Equity.

The bill was filed by John G. Goesele and six other persons, as heirs at law of Johannes Goesele, deceased, against Bimeler and twenty-four other persons, members of the Society of Separatists.

The facts of the case are stated in the opinion of the court.

The Circuit Court dismissed the bill, and the complainants appealed to this court.

It was argued by *Mr. Quinn,* for the appellants, and by *Mr. Stanberry* and *Mr. Ewing,* for the appellees.

*Mr. Quinn,* for the appellants, stated the facts in the case, the articles of association made in 1819 and 1824, and then made the following points :

1st. That the purchase being made for the use of all the members of the company, the purchase-money paid with the issues and profits of their joint labor or joint means, and the title taken by Bimeler, either with or without a fraudulent intention, makes him a trustee of the legal estate, holding to the use of the members of the company, each of whom own an undivided portion of the whole trust or equitable estate.

2d. That this trust, or equitable estate, is an estate of inheritance, alienable and descendible like any other fee. 8 Ohio R. 398; 9 Ohio R. 145. And that of such an estate Johannes Goesele died seised in 1827.

Here we think the argument properly ends, and that the complainants are entitled to an account and partition. But to the case made upon the articles, we say —

1st. That if the articles of 1819 constituted a partnership, (which we think they did not,) it became dissolved by Johannes Goesele's death, or by the first change in its constituent parts.

2d. That the articles of 1824 are void for no less than four different reasons.

1. Because there is no grantee or assignee to take the property from the natural persons. Sloan *v.* McConahy, 4 Ohio R. 169. The society being unincorporated. 4 Wheat. 1.

2. Because the trusts are vague and uncertain. 3 Kent's Com. 303; Bacon's Ab., Uses and Trusts, 256; Tomlins's L. Dict., Trusts; Story's Eq. § 979 to § 1070; 12 Ohio R. 287; 5 Mass. 504; Swan's Ohio Stat. 319; 2 Spencer's Eq. 106; 7 Eng. Com. Law R. 267.

3. Because they create a perpetuity. Story's Eq. § 974, n.; 10 Ohio R. 4; 2 Spencer's Eq. 93, et seq. 106; 4 Ohio R. 515; Lord Deerhurst v. Duke of St. Albans, 5 Mad. 235; 4 Kent's Com. 267, 271; 1 Cox, 324; 1 Bing. 104.

4. Because they are the work of imposition, and a scheme of Bimeler to defraud his *cestui que trusts.*

In addition to these two exceptions taken to the articles of 1824, two others are made, which are alike common to both, and which, in their natural order, lie in advance of those just taken. They are—

1st. That no articles were executed, some of the members having failed to sign; among whom is the defendant Bimeler, who now claims protection under them.

2d. That the so-called Separatists' society, at Zoar, is not an association or community, but is an institution of a master and his slaves, or what the Roman jurists characterized as *societas leonina.* Story on Part. § 18.

Bimeler, upon the face of his pleadings, presents five points of defence.

1. That by the articles, there is a surrender of property, and that in consequence no property descended to Goesele's heirs.

2. That the institution is to be taken as a general partnership, with the principles of succession ingrafted upon it, and its property is to be taken as personalty.

3. That in virtue of the act of incorporation, passed in 1832, the entire property passed to the corporation.

4. That Johannes Goesele's labor was not worth more than his support.

5. That the property has been improved with regard to a common ownership, and cannot now be divided.

The *first* of these points, we say, admits the first objection made to the articles of 1824, viz., the want of an assignee. For, while it claims a surrender, it does not show to whom that surrender was made.

Upon the *second* point, we think the articles do not constitute a partnership; yet, if they do, we think it is a waiver of the whole defence; for, if the members were partners, they owned the property. But a partnership, with the principle of succession ingrafted upon it, would be a corporation, which individuals have not the power of making. In the consideration of these points, the following cases are cited: Miles v. Fisher, 10

Ohio Rep. 1; Story on Part. § 273, § 18; 15 Johns. Rep. 159; 11 Mass. Rep. 469; Swan's Ohio Statutes.

The *third* point, namely, that Goesele's property passed to a corporation, five years after his death, is not the law. 8 Pick. Rep. 455.

Upon the *fourth* point, we say that, whether Goesele's labor was worth more or less than his support, is a matter after which the court will not inquire; but, finding him a member of the company, and a joint owner of the estate, will presume his share equal to that of the other members. If, however, it makes the inquiry, it will find that he contributed about twice or three times his proportionate share.

The *fifth* and last point presented on the face of the pleadings, namely, that the property has been improved with regard to a common ownership, and is incapable of division, we cannot but regard as trifling. And yet we find that depositions, covering no less than thirty pages of printed record, have been taken to prove this point, together with one other of similar importance, namely, that the members are well clothed, well fed, and are contented.

One other point was raised by the defendant, Bimeler, at the hearing below, and will probably be raised again. It is, that " the society is a charity," or rather that the property is a donation to charitable use. This, we say, it is not, and cite Ambler, 652; Story's Eq. § 1156, 4th ed., § 1182, 1183; Rabb *v.* Read, 5 Rawle's Rep. 154; Chase's Ohio Statutes, 1066; Swan's Ohio Statutes, 782; 4 Wheat. 1.

We are advised that it will be insisted that the society is what is called a universal partnership. If it is, it will not help the defence; for such partnerships differ from ordinary partnerships only in the extent of the investment; that is, the members invest their all, all their labor, property, and skill; but in every other particular, including the causes of dissolution, they are governed by the same rules that govern ordinary partnerships. Were they, however, such as is claimed by the defence, they would be corporations.

Again, we are advised that it will be claimed that the articles are a contract for survivorship. To this we answer, that nothing can be farther from both the letter and spirit of the instruments. Instead of its being provided that one shall survive to the estate of another, it is expressly provided, that no one shall survive to, or even have any thing; and in this particular the first decedent and the last survivor are placed in precisely the same situation. Nothing could be more foreign from the intention, than that the last survivor and his heirs should take the whole property, to the exclusion of the heirs of all the other members.

That Goesele once owned the property, is admitted; and Bimeler claims to be nothing but a trustee. In this situation, when called upon by the *cestui que trust* to convey the legal title, he endeavors to defend himself by saying, that *cestui que trust* assigned his interest to a third person. This kind of defence cannot be sustained. For as he is a mere stakeholder, by his own showing, he must file his bill of interpleader, and bring that third party before the court to litigate the right.

He claims protection, too, under instruments which he never signed, but which he got others to sign, by representing that he would also be a subscriber.

Great complaint is made from the other side, that we are endeavoring to infringe upon their liberties by prohibiting them from living in community. This is not so. Mr. Bimeler and his adherents may live in any way they please, provided they live on their own property; but we are unwilling to give them our property to enable them to live in any way whatever. They say, too, that the appointment of a receiver or a partition will break up the society. If it does, it ought to be broken up; for it is an evidence that the members do not wish to live as they do.

The articles of 1833 purport to be a revision of those of 1819 and 1824, and also to be an acceptance of an act of incorporation passed in 1833; but they form a society entirely different from the one created by the act, for which reason, we think, the grant of corporate power has been rejected. A grant of corporate power must be received as it came from the hands of the legislature, or it is not received at all. Kirk *v.* Newill, 1 T. R. 71.

Their by-laws, too, which are required by the statute to be consistent with the laws of the United States and the State of Ohio, are opposed to public policy.

They require the alienating rights which are unalienable, and close the doors of the courts of justice against the citizen. Constitution of Ohio, §§ 1, 16, Bill of Rights; 1 Blackf. 122; 19 Wend. 77. Deprive the husband of his curtesy and the widow of her dower. 4 Kent, 131; 3 Id. 30, e; 2 Spencer's Eq. 104; 1 Eden, 415. Their trusts are also vague and uncertain. They are also executory, and, to divest the member of his property, are without consideration.

Under these articles, as well as under those of 1824, if they are sustained, Bimeler will eventually take the whole property in absolute ownership. He still holds the legal title. The members, according to his defence under the articles of 1824, hold an use while they remain members; consequently, when they cease to be members, either by death or otherwise, the use

estate becomes extinct, and his legal title takes the absolute property. The same is the case under the articles of 1833, supposing the company to be incorporated; for by that arrangement the corporation holds the use estate in trust for the use of the members. When the members die, then the corporation dies, and, as a consequence, there is nobody to look after the trust; therefore, whether the company is or is not incorporated, Bimeler's legal title will eventually take the whole estate.

Such an advantage, to be acquired by an agent over his principals, a preacher or pastor over his people, and a trustee over his *cestui que trusts*, cannot be sustained by any enlightened system of jurisprudence.

*Mr. Stanberry's* brief was as follows:

I propose, in the first place, to consider the character and legal condition of this association, as it stood upon the mere agreements of 1819 and 1824, before it became clothed with a corporate capacity.

It is said it was simply a partnership, liable to the incidents of that condition, and subject to the operation of all the ordinary causes of dissolution. That, in point of fact, it was dissolved by the first death which happened amongst its members, and was capable of dissolution and partition of its real estate, at any time, at the instance of any member.

If it were a pure partnership, these results would have followed. But I claim this association is not of that character.

The original agreement provides for a perfect community of property, real and personal, and for a succession or survivorship among members on the Tontine principle. It guards, with great care, against the dissolution of the body. Its property consisted, at the beginning, of a common stock of money and chattels, contributed in unequal proportions by the members, with which, and the labor of the members, real estate and personalty, to a very large amount, were in process of time accumulated. The legal title to the real estate has always been vested in Joseph M. Bimeler, one of the members. The business of the society has been various. Agriculture, manufactures, and merchandise, have been carried on simultaneously. From 1817 to 1833, a period of seventeen years, during which it was unincorporated, various changes took place in the body of the society, by deaths, withdrawals, expulsions, and admissions of members.

With this general outline, we can enter upon the inquiry which is opened by the objections on the other side.

And first, we say, this was not a mere partnership, nor the members tenants in common. The agreement for community

of property, the mutual surrender of all individual property into the common stock, and the express stipulations against any reclamation in the case of withdrawal, and for the preservation of the common property, for the exclusive use and perpetual enjoyment of the members, in succession, are inconsistent with the incidents of mere partnership or tenancy in common.

There can be no question as to the intent of these stipulations. The only doubt is as to their legal practicability.

The actual practicability of such a society is demonstrated in this instance. For the sixteen years in which it existed without a charter it fulfilled all the purposes of its formation, and secured the comfort and well-being of its members, beyond the common lot.

But, it is said, there are legal difficulties which the agreement of the parties cannot surmount. Let us consider them.

1. It is said, upon the death of a member, the society was dissolved *ex necessitate*. This consequence, though generally true as to partnerships, does not follow where the agreement provides against it. It is not an inevitable consequence. The doctrine of dissolution upon the death of a partner, only obtains where the deceased partner has a continuing interest in the property or profits of the association. It is not just that the surviving partners should be obliged to carry on the business, without his coöperation, for the benefit of his estate. Story on Partnership, 453.

I have said this society was not an ordinary partnership. It very closely resembles that sort of partnership in the civil law, which is called universal. " Universal partnerships (*des societies universelles*) are contracts by which the parties agree to make a common stock of all property they respectively possess — they may extend it to all property, real or personal, or restrict it to the personal only. They may, as in other partnerships, agree that the property itself shall be common stock, or that the fruits only shall be such; but property which may accrue to one of the parties, after entering into the partnership, by donation, succession, or legacy, does not become common stock, and any stipulation to that effect, previous to the obtaining of the property aforesaid, is void." "An universal partnership of profits includes all the gains that may be made, from whatever source, whether from property or industry, with the restriction contained in the last article, and subject to all legal stipulations between the parties." Civil Code of Louisiana, art. 2800, 2801.

These universal partnerships have been adopted into the common law. Mr. Justice Story thus defines them: " By universal partnerships, we are to understand these, that where the

parties agree to bring into the firm all their property, real, personal, and mixed, and to employ all their skill, labor, services, and diligence, in trade or business, for the common and mutual benefit, so that there is an entire communion of interest between them. Such contracts are within the scope of the common law, but they are of very rare existence." Story on Part. 104.

Such a form of association being within the scope of the common law, can it be doubted that, by the mutual consent and agreement of the members, the effect of a dissolution by death may be provided against?

In England, and in the United States, large associations and joint stock companies exist, under agreements which protect the members, *inter sese,* from the ordinary incidents of partnership, such as dissolution by death, bankruptcies, assignments, &c. Collyer on Part. 614; Livingston v. Lynch, 4 Johns. Ch. Rep. 573.

This association is a general partnership, with the principle of survivorship ingrafted upon it. In this particular it takes the character of a Tontine, which is a society with the benefit of survivorship, the longest liver taking the common property in absolute ownership. Encyclopædia Brit. vol. 37, art. Tontine; Encyclopædia Amer. vol. 12, art. Tontine.

I can see no objection to this provision as to ownership. Certainly as to personalty there can be no difficulty; but it is said, in so far as the real property of the company is concerned, there can be no joint tenancy, no right of survivorship, in Ohio; and that upon a death of a member, his interest in the real estate passes to his heirs at law, and that at any time the right to partition might be asserted.

As to that, it is to be considered, in the first place, that this is a partnership, and that the real estate is, by the articles of association, expressly made a part of the common stock. This, in equity, stamps it with the character of personalty. Summer v. Hampson, 8 Ohio Rep. 328.

Fortunately for the society, the title to its real estate has always been well vested in one individual. No question can be raised in this case as to the condition of that legal title, and as to the equitable title or use, that was in the members before the act of incorporation, and since then it is in the corporate body.

I do not doubt, however, that as a general principle, equitable estates follow the same rules as to descent, &c., with legal estates. What I mean to say in reference to the legal, as distinguished from the equitable, title, is, that there is a necessity it should vest somewhere, and conform to general rules as to transfer, descent, &c.

Being relieved, in this case, from any difficulty as to the condition of the fee in the real estate of this society, all we have

to look to, is merely the equitable interest or use which enured to the members, who stood in the relation of *cestuis que trust* to Bimeler, the holder of the legal title. As I have before said, this interest in partnership property is viewed in this court simply as personalty.

But if that were not so, if it were strictly an interest in real estate, and to be made conformable to the rules which govern real property, I deny that the principle of survivorship may not be grafted upon it.

Our court has said, in an early case, (Sergeant *v.* Steinberber, 2 Ohio Rep. 126,) that the estate by joint tenancy does not exist in Ohio. That case only required of the court to decide that it does not exist here by mere operation of law. But that the principle of survivorship may not be provided for and exist by limitation, in Ohio, has never been decided. On the contrary, we have reported cases which recognize it. Miles *v.* Fisher, (10 Ohio, 1,) is a case of that character. The court say in that case, " Laying out of view the doctrine of survivorship, resulting from joint tenancy, an incident of the estate depending on the law and not on the act of the party, we find the testator, by express words, limiting the estate to three trustees and the survivor. The estate well passes by these words to the survivor for life, the remainder in fee is not disposed of."

There is, then, no objection to survivorship by express limitation or agreement. This being so, there has been no descent to any heirs of the deceased members of the society, and there is no present right of partition in any of the living members.

It is also said that even as to the personal property, it is difficult to fix its ownership distinct from the individual right of each member making the contribution, and that the idea of accumulation for an unincorporated body is a fallacy.

This difficulty is altogether fanciful. The members of this partnership are in no way uncertain, for no one is a member whose name is not subscribed to the articles of association. It is a large partnership. The accumulation is for the partners, not for an ideal company or mere abstraction. The property loses its individuality as to ownership the instant the owner becomes a member. It stands like the property of any other partnership. The partners are joint owners. No formal transfer or delivery is necessary; the possession by one partner is the possession of all.

Objection is also made to this association, that the principle of community and succession of property among the members, involves a *perpetuity.* There is nothing like a perpetuity in it. The society has the perfect right of disposal over all its property, real as well as personal, and this power of disposal is

wholly inconsistent with the idea of perpetuity, which only exists where property is so limited that no living agency can unfetter it.

It is further urged that this society is contrary to the genius of our free institutions — that its constitution enforces perpetual service and adherence to a particular faith, and that it is aristocratic in its tendency.

If there were any thing in such objections, the constitution answers them all. So far from being at all aristocratic, this society is a pure democracy. All the officers are chosen by ballot, every member, male and female, having an equal voice; and the body of the society reserves to itself the power of removing officers, and changing the form of government at pleasure. All distinctions of rank or wealth are abolished, and a perfect equality provided for. No single dogma in religion or politics is announced, no unusual restraint on marriage, nor subserviency to any doctrine out of the common way, exist; and so far from any enforcement of perpetual service being provided for, the right is reserved for every member to retire from the society at pleasure, with the single condition that no claim is to be set up for services or property contributed. The powers which the society confides to its officers are temporary, and so distributed as to prevent any one member or officer from engrossing too much power.

Besides this liberal frame of government, the constitution, by very full enactments, provides for the education of the children, the comfort and support of all the members, and the peaceable settlement of all controversies by domestic tribunals. It is impossible to hold that such a constitution is contrary to public policy, or in any sense illegal. To say that such a society cannot exist under our form of government is a libel on our free institutions.

Here are a number of persons, who, in the exercise of their mature judgment, and following their own peculiar views, have thought it best, more than thirty years ago, to associate as one family, in a communion of property. From that time to the present, through an entire generation, their experiment has been successful. They have lived in peace, plenty, and happiness, beyond the common lot. The legislature has given them a charter to perpetuate their social existence; and now it is urged that, in this land of liberty, the right does not exist to live in this way; a very bright idea, truly! If a despot proclaimed such an edict, forbidding men to pursue their own mode of life, in their own inoffensive way, we could understand it; but it is quite new as a democratic idea.

Goesele et al. *v.* Bimeler et al.

(*Mr. Stanberry* then cited and examined the cases of Waite *v.* Merrill et al. 4 Greenleaf, 102; Schriber *v.* Rapp, 5 Watts, 351; Gass and Bonta *v.* Wilhite et al. 2 Dana, 170. He then contended that this society was protected by the doctrine of charities, and by its act of incorporation.)

*Mr. Ewing's* brief was as follows.

1st. The executor or administrator of Goesele is not a party to this suit; therefore no question as to personal property can arise.

I now state the proposition as applying to property purely personal, but will, in the course of my argument, show that it controls also the real estate owned by this association, to which the law attributes the qualities and consequences of personalty.

2d. This suit, therefore, involves nothing but title to real estate, and the question is, did Goesele die seised of an inheritable estate in the lands and tenements named in the bill.

We have the object and terms of the original purchase from no other source than the answer of Bimeler. He says he purchased it for the Separatist society, took a deed in his own name, and gave his own bonds for the payment of the purchase-money. P. 6.

And it was purchased with the understanding at the time that it should be paid for with the means and labor of those of the Separatists who would settle upon it, and that each should have thereof in proportion to the amount that he or she should contribute to paying therefor. P. 14.

It is obvious, at once, that here was yet no partnership. And there was yet no contract between Bimeler and either or all of the other parties which equity could enforce.

No one was yet bound to Bimeler, that he should go upon the land or pay for any part of it; as a correlative proposition, Bimeler was not bound to hold the land, or any part of it, in trust for any of them. Both parties must be bound or neither. Goesele, however, went on to the land, and built a small log-house on a town lot in Zoar, previous to 1819. Some conflict in the evidence about the building. He went into a house.

He was still under no contract to pay for any of the land. He still had no right to any definite part or amount, on making payment, unless it may have been the town lot on which his house was built.

He had yet paid nothing, applied nothing; had no contract which equity could regard.

If, the hour before the execution of the articles of April 5th, 1819, Goesele had claimed a definite portion of the land, and offered to pay for it in proportion to the cost of the whole, a court of equity could not have denied it to him.

If Bimeler had declared that he would thenceforth hold the land to his own use, and that his associates should have none of it, equity could not have relieved them by decreeing to them parts of the land. The law, however, would have given them a *quantum meruit* for the labor which they had performed.

Or, if I be mistaken in this, and he had any interest in the land which equity could recognize, it was held by such loose and uncertain tenure, that he could abandon it by any word or deed showing a purpose not to retain or rely upon it. Goesele, therefore, was entitled to nothing, except what the articles of brotherhood and association gave him.

The genuineness of the articles is doubted, and we are called upon for proof that Goesele signed them. We are content that the court should regard them as not in evidence, and especially that Goesele never signed them. If that be so, we think it very clear that he never had any right whatever, except to a compensation in money for his services, if he rendered any, of value beyond his maintenance, nursing, and burial. But this is a question which none but his administrator is competent to litigate.

But he had rights under those articles of association, and as his counsel is probably not seriously disposed to repudiate them, I will inquire what the rights were which were conferred by them.

Waiving, for the present, the question whether this was or was not a charitable association, and, as such, protected by the law of charities, I will examine it as a mere attempt to dispose of property and give it direction.

I will suppose Bimeler to have signed the articles, as he intended to be bound by them, and would have signed them had the land been paid for and his notes taken up, and he did sign soon after this was done.

Then if the articles were good to transfer real estate in equity, they were good to transfer personalty, and equally good to limit and direct the real estate transferred.

What title to the real estate do these articles vest in Goesele? It is to be borne in mind, that down to this time Bimeler had the legal estate, and Goesele had no interest in it which a court of equity could regard.

The articles give to Goesele a right to live upon, and enjoy a fair proportion of the land, during his life; to raise and have his children educated and maintained upon it; to take part, with others, under rules agreed upon between themselves, in its management and control. These rights, however, were conferred subject to conditions and forfeiture.

But the conditions were complied with, namely, that he should surrender whatsoever property he had, to the association,

and live and labor with them during his life. He did not incur a forfeiture; he had then purchased this right, and he enjoyed it; he lived, died, and was buried in the lands with his brethren in the faith.

Can there be a doubt that all the parties were competent to make this contract? But if there be a doubt, can a question now arise as to their competency, since both parties kept it, and executed it faithfully to the end?

No complaint on either side, of wrong or violation, until the contract, as far as Goesele was concerned, was completely executed and ended.

But if this contract could not be legally entered into by Goesele with the other members, no valid contract whatever was entered into by him or for him.

Bimeler agreed to surrender this land to the association, to be held in this manner, and on these conditions. He never did agree, and never would have agreed, to surrender it to these one hundred and fifty men and women as a partnership, subject to the consequences of partnerships, dissolution by the death or withdrawal of a member, and consequent partition, at least three times a year, of land and personalty.

If equity cannot sustain the contract which the parties did make for themselves, it will not make a contract for them which they never did make, and never intended to make, and which would defeat all their objects.

But it will carry out the contract according to their intent, as far forth as the principles of law will permit. This will readily and without a single difficulty, that I can discover, dispose of Goesele's interest, and consequently of this case.

Goesele might, without the violation of any rule of law, give his labor and property, if he had any, in consideration of the provision for life herein made for him.

Bimeler might, in like manner, bind his land in equity to make good such provision.

3d. But I do not, for myself, perceive any serious difficulty in transmitting the property, with the personalty and the equitable title to the realty, in the manner adopted by these articles.

Cannot a man transfer the equitable title to his real estate to ten men, designated as those who live on it and have signed the article of transfer with him, to be used and enjoyed by them as long as they shall abide by the terms of the article, and giving a right to the persons, to whom he so transfers, to vest the same right in others, in succession, who shall enter into the same article in future, and comply with its conditions, the majority having, as in this case, the power to sell and dispose

of the property, but required to apply the proceeds to the same object?

This is not a perpetuity in the common-law sense of the term; it does not tie up real estate, for it may be disposed of at any time. Such a limitation of the real estate, or its proceeds, would be good, by the laws of Ohio, for the lives in being; and each tenant for life, by his own signature, if the full estate at any time vested in him or them, could equally well transmit it to another life, and so in succession, a majority being at all times able to terminate the succession at pleasure.

4th. But if I be wrong in this, and difficulty arise as to the final disposition of the property, when the end cometh, which is not yet, that difficulty is removed by the law of charitable uses, considered in Mr. Stanberry's brief.

5th. And if this be not a charity, and as such protected by equity, and if the contract made by the parties for themselves be invalid for the purposes intended, it is still good as a partnership with succession, by the express agreement of the parties, an agreement, so far, unobjectionable. All the property owned in common, real as well as personal, is necessary to carry on the partnership; it is, therefore, all personalty in equity. And the partners, or a majority of them, can readopt their rules or change them at pleasure, and transmit their property by succession as heretofore, or divide between the partners.

6th. But if it were indeed a partnership, we have not the necessary parties in court. The property is all personalty, and neither executor nor administrator of Goesele is in court.

Mr. Justice McLEAN delivered the opinion of the court.

This case comes before the court on an appeal from the Circuit Court of the District of Ohio.

In their bill the complainants represent that they are the heirs at law of Johannes Goesele, who died at Zoar, in the county of Tuscarawas, Ohio, in the year 1827; that the said Johannes, in his lifetime, associated himself with the defendants, Bimeler and others, and formed a society of Separatists, and in the year 1817 they purchased of one Godfrey Haga, of Philadelphia, a tract of land situated in said county, containing 5,500 acres; that afterwards other purchases were made, which, when added to the first purchase, amounting to 10,000 acres, with a large number of town lots, and other property procured about the same time; that these purchases were made on behalf of Goesele, deceased, and his associates, and for their use, and the purchase-money was paid by their joint labor and money; that Bimeler acted fraudulently as their agent, in taking the deed and title papers to himself and his heirs forever.

They further represent that many of his associates sold their interest to their ancestor, on leaving the society. And the defendants allege, that, as heirs of their ancestor, they are entitled to one hundredth portion of the estate now held by Bimeler; and that they have requested the defendants to make partition of the estate, which has been refused; that Bimeler, although often requested, has refused to convey to the complainants any part of the estate; and they pray that he may be compelled to give a full and true description of the property held by him as stated; and that on a final hearing he may be decreed to make partition of the said property, and to make a good deed in fee-simple to the complainants, for so much of the said property as may be found to belong to them.

In the year 1817, the members of the above association emigrated from Germany to the United States. They came from the Kingdom of Wertemberg, where they had been known for years as a religious society called Separatists. They were much persecuted on account of their religion. Goesele, the ancestor of the complainants, with another member, had been imprisoned for nine years; and the safety of Bimeler depended on his frequent changes of residence, and living in the utmost privacy. In that country they sought to establish themselves by purchasing land, but they found that the laws would not allow them this privilege. Disheartened by persecution and injustice, they came to this country in pursuit of civil and religious liberty. When they arrived at Philadelphia, they were in a destitute condition. They were supported while in that city, and enabled to travel to the place where they now live, by the charities of the Friend Quakers of Philadelphia and of the city of London. These contributions amounted to eighteen dollars to each person. A large majority of the society consisted of women and children.

While at Philadelphia, Bimeler, the head and principal man of the association, purchased, in his own name, from Godfrey Haga, the five thousand five hundred acres of land, as stated in the bill. A credit of thirteen years was given, three years without interest. A deed to Bimeler and his heirs was executed for the land, the 7th of May, 1818; a mortgage to secure the consideration of $15,000 was executed. On their arrival at the place of their destination, they found it an unbroken forest; their means were exhausted, and they had no other dependence than the labor of their hands. They were no strangers to a rigid economy, and they were industrious from principle.

At the time of their settlement at Zoar, they did not contemplate a community of property. On the 15th of April, 1819, articles of association were drawn up and signed by the mem-

bers of the society, consisting of fifty-three males and one hundred and four females. In the preamble they say, " that the members of the society have, in a spirit of Christian love, agreed to unite in a communion of property, according to the rules and regulations specified." The members renounce all individual ownership of property, present or future, real or personal, and transfer the same to three directors, elected by themselves annually; that they shall conduct the business of the society, take possession of all its property, and account to the society for all their transactions. Members who leave the society are to receive no compensation for their labor or property contributed, unless an allowance be made them by a majority of the society.

These articles continued in force until the 18th of March, 1824, when amendatory articles were drawn up and signed by the members at that time, consisting of sixty males and one hundred females. In these articles an entire union of property is declared, and a renunciation of individual ownership. Males of the age of twenty-one, and females of the age of eighteen, become members by signing the articles. New members are received in this way. The directors elected by the society conduct the affairs of the association, and provide for the boarding, lodging, and clothing of the members. The directors are to apply themselves for the common benefit of the society, provide for the children, determine disputes among the members, with a right of appeal to the board of arbitration. Other provisions were made for the expulsion of members, and the general good order and welfare of the society.

In the year 1832, the society was incorporated by a law of the State, which gave to them the ordinary powers of a corporation. On the 14th of May, 1833, a constitution was adopted under the act, which was signed by fifty-one males and one hundred and three females. The constitution embodies substantially the regulations contained in the preceding articles, and some others conformably with the corporate powers conferred.

This is the outline of the association formed at Zoar. It appears a different plan was at first adopted. Each family was to select from the general tract as many acres as it could pay for, and improve it, living on its own industry, and from the same source paying for the land. But this plan was found impracticable, and in less than two years it was abandoned, and the first articles of association were adopted.

The ancestor of the complainant, as stated, died in 1827, a member of the society. His name was signed to the articles of 1819 and 1824. There was no evidence in the case conducing to prove any contract, except that which arises from the articles

referred to. On the first payment made for the land, it appeared that Goesele paid a small sum that remained unexpended of the eighteen dollars he received at Philadelphia.

The answer denies the allegations of the bill charging fraud, and every allegation to charge the defendants, except the purchase of the land and the articles referred to.

It appears, by great industry, economy, good management, and energy, the settlement at Zoar has prospered more than any part of the surrounding country. It surpasses, probably, all other neighborhoods in the State in the neatness and productiveness of its agriculture, in the mechanic arts, and in manufacturing by machinery. The value of the property is now estimated by complainant's counsel to be more than a million of dollars. This is a most extraordinary advance by the labor of that community, about two thirds of which consists of females.

In view of the facts stated, it is not perceived how the case made in the bill can be sustained. A partition is prayed for; but there is no evidence on which such a right can be founded. The plan, as stated, first agreed upon at Zoar, for individual proprietorship and labor, was abandoned in less than two years. It was a parol contract, no consideration being paid. No right was acquired by the ancestor of the complainant on this ground. He then signed the first articles, which, like the amended articles, renounced individual ownership of property, and an agreement was made to labor for the community, in common with others, for their comfortable maintenance. All individual right of property became merged in the general right of the association. He had no individual right, and could transmit none to his heirs. It is strange that the complainants should ask a partition through their ancestor, when, by the terms of his contract, he could have no divisible interest. They who now enjoy the property, enjoy it under his express contract.

But if there were a right of partition by the complainants, there is no such statement in the bill as would authorize the court to decree it. For the time that Goesele lived, what was the value of his labor in comparison with the labor of the others? Twenty-five years have elapsed since his death. The property has increased in value seven hundred per cent.; and of this property partition is prayed. But there is not a shadow of evidence to sustain the right. The proofs and the statements in the bill are as remote and inconsistent as can well be conceived.

The fraud charged on Bimeler, in the purchase of the land, if true, could not help the case made in the bill. But the charge has no foundation. Bimeler purchased the land in his own

51 *

name, and became responsible for the payment of the consider-
ation.    And he retained the title until the purchase-money was
paid, and an act of incorporation was obtained, when he signed
the articles, and placed the property under the control of the
society, he having no greater interest in it than any other indi-
vidual.    But, before this, he openly declared that he held the
land in trust for the society.    As an honest man, he could not
change, if in his power, the relation he bore to the vendor, until
the consideration was paid.    In this matter, the conduct of
Bimeler is not only not fraudulent, but it was above reproach.
It was wise and most judicious to secure the best interests of
the association.

The articles of 1819 and 1824 are objected to as not consti-
tuting a contract which a court of equity would enforce.    And
it is said that chancery will not enforce a forfeiture.    As a gene-
ral rule, chancery may not enforce a forfeiture; but will it re-
lieve an individual from his contract, entered into fairly, and for
a valuable consideration ?    What is there in either of these
articles that is contrary to good morals, or that is opposed to
the policy of the laws ?    An association of individuals is formed
under a religious influence, who are in a destitute condition,
having little to rely on for their support but their industry; and
they agree to labor in common for the good of the society, and
a comfortable maintenance for each individual; and whatever
shall be acquired beyond this shall go to the common stock.
This contract provides for every member of the community, in
sickness and in health, and under whatsoever misfortune may
occur.    And this is equal to the independence and comforts
ordinarily enjoyed.

The ancestor of the complainants entered into the contract
fairly and with a full understanding of its conditions.    The
consideration of his comfortable maintenance, under all circum-
stances, was deemed by him an adequate compensation for his
labor and property contributed to the common stock.    But it is
not shown that Goesele or any other member contributed to the
general fund, with the exception of a small sum by Goesele,
which, probably, could not have exceeded five dollars.    The
members of the association were poor, and were unable to con-
tribute any thing but labor.    In this way the land purchased by
Bimeler was paid for.

The complainants speak of the interest of their ancestor in
the real and personal estate, owned by the association, and their
counsel contend that the articles did not divest him of either,
but both descended to his heirs at law at his death.

This argument does not seem to comprehend the principles
of the association.    Land and other property were to be ac-

quired by the members, but they were not to be vested with the fee of the land. While they remained in the society, under its general regulations, the products of their labor on the land and otherwise were applied, so far as necessary, to their support. Beyond this, they were to have no interest in the land or in the personal property. Many of the members were aged females, others, from sickness or disease, were unable to labor, but every one, whether able to labor or not, was provided for by the labor of the community. This was a benevolent scheme, and from its character might be properly denominated a charity. But from the nature of the association and the object to be attained, it is clear the individual members could have no rights to the property, except its use, under the restrictions imposed by the articles. The whole policy of the association was founded on a principle which excluded individual ownership. Such an ownership would defeat the great object in view, by necessarily giving to the association a temporary character. If the interests of its members could be transferred, or pass by descent, the maintenance of the community would be impossible. In the natural course of things the ownership of the property in a few years, by transfer and descent, would pass out of the community into the hands of strangers, and thereby defeat the object in view.

By disclaiming all individual ownership of the property acquired by their labor, for the benefits secured by the articles, the members give durability to the fund accumulated, and to the benevolent purposes to which it is applied. No legal objection is perceived to such a partnership. If members separate themselves from the society their interest in the property ceases, and new members that may be admitted, under the articles, enjoy the advantages common to all.

The counsel for the complainants imagine the original members possessed property, real and personal, before they entered into the association, which is contrary to the facts of the case, and then contend that, having executed no conveyance of the property, on the death of the member it descended to his heirs at law.

It is always desirable that legal principles should be applied to the facts of the case. When the members first formed the association they were destitute of property. The purchase of the land by Bimeler had been made, but not paid for; and the members had no means of payment but by the labor of their hands. This they agreed to give, in consideration of being supported in sickness and in health, disclaiming, at the same time, any individual claim of ownership to any property which should be acquired by the community. This statement of facts ob-

viates many of the objections urged by complainants' counsel. If the members of the association had no interest in the land when they signed the articles, no conveyance of it by them was necessary. They stipulated a compensation for their future labor in the support to be given them, and disclaimed the ownership of all property acquired.

It is said, where a member is excommunicated or leaves the society he forfeits his rights, and that chancery will not enforce a forfeiture. What is the extent of this forfeiture? It is the right to a support from the society. And this is certainly reasonable. Can a member expect to be supported by the society, when he refuses to perform his part of the contract which entitles him to a support? He claims pay for his labor. He has been paid for this, in pursuance of his own contract. In sickness and in health he has been clothed and fed, and a home provided for him. But he claims payment for property which he surrendered to the association at the time he became a member of it, by signing the articles. The ownership of this property he relinquished to his associates as a part of the contract; and for the considerations named, all the demands for such property in the language of the articles signed, " the individual abolished and abrogated for himself and his heirs."

Can property thus conveyed be deemed forfeited, if not recoverable? A forfeiture is against the will of the owner. Where property is conveyed under a fair contract and for a valuable consideration, is not the term forfeited misapplied, if such conveyance be held valid? Chancery is not asked to enforce a forfeiture in this case. No property is shown to have been transferred to the association by the ancestor of the complainants. But if property had been given by the ancestor, would a court of chancery direct such property to be surrendered or paid for against the express contract of the owner? The surrender or giving up of the property was a part of the consideration on which the association stipulated to support him. It cannot be separated from that agreement. And it is clear, where the fault of not carrying out the contract is not attributable to the association, but to the member, he cannot have the aid of a court of chancery.

Do the articles constitute a perpetuity? We all think that they do not. They provide for the continuance of the association an indefinite period of time, in the exercise of the discretion of its members. But there is no obligation to this extent. The majority of the members may require a sale of the property and break up the association. In fact the majority governs, by the election of officers. Members may be expelled from the society and new ones admitted, under established rules. Whilst

the society has the means of perpetuating its existence, it may be said to depend for its continuance, on the will of a majority of its members.

As the law now stands in England, a conveyance by executory devises, to be good, cannot extend beyond a life or lives in being, and twenty-one years and the fraction of another year, to reach the case of a posthumous child.    Atkinson v. Hutchinson, 3 P. Wms. 258 ; Long v. Blackall, 7 Term, R. 100.

There are many depositions in the case, taken in behalf of the complainants, by persons who have been expelled from the society, or, having left it, show a strong hostility to Bimeler. They represent his conduct as tyrannical and oppressive to the members of the association, and as controlling its actions absolutely.    And several instances are given to impeach his moral character and his integrity.    Two of the witnesses say that he drives a splendid carriage and horses.

In regard to the carriage, it is proved to be a very ordinary one, worth about three hundred dollars, one of his horses worth about twenty dollars and the other thirty or forty.    By respectable persons out of the society, Bimeler's character is sustained for integrity and morality, and several instances are given where, even in small matters, he deferred to the decision of the trustees against his own inclination.    And many facts are proved wholly inconsistent with the charge of oppression.

That Bimeler is a man of great energy and of high capacity for business, cannot be doubted.    The present prosperity of Zoar is evidence of this.    There are few men to be found any where, who, under similar circumstances, would have been equally successful.    The people of his charge are proved to be moral and religious.    It is said that, although the society has lived at Zoar for more than thirty years, no criminal prosecution has been instituted against any one of its members.    The most respectable men who live near the village say, that the industry and enterprise of the people of Zoar have advanced property in the vicinity ten per cent.

Bimeler has a difficult part to act.    As the head and leader of the society, his conduct is narrowly watched, and often misconstrued.    Narrow minds, in such an association, will be influenced by petty jealousies and unjust surmises.    To insure success these must be overcome or disregarded.    The most exemplary conduct and conscientious discharge of duty may not protect an individual from censure.    On a full view of the evidence we are convinced that, by a part of the witnesses, great injustice is done to the character of Bimeler.    On a deliberate consideration of all the facts in the case, we think there is no ground to authorize the relief prayed for by the

complainants.   The decree of the Circuit Court is therefore affirmed.

## Order.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Ohio, and was argued by counsel.   On consideration whereof it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed with costs.