SCHWARTZ et al. v. DUSS et al.

(Circuit Court of Appeals, Third Circuit. July 10, 1900.)

No. 27.

APPEAL—REVIEW—FINDINGS OF FACT.

Where a circuit court, with the consent and agreement of parties, appoints a master with authority to take testimony and find all issues of law and fact, findings of fact made by the master and confirmed by the court are conclusive on appeal unless plain error is unmistakably shown; and, unless such plain error is found, the appellate court will not review questions of law which could only arise on a state of facts different from that found.

Appeal from the Circuit Court of the United States for the Western District of Pennsylvania.

This was an appeal from the decision of the circuit court reported in 93 Fed. 528.

George Shiras and S. Schoyer, Jr., for appellants.

D. T. Watson, for appellees.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge. This is an appeal from the decree of the circuit court for the Western district of Pennsylvania. The plaintiffs below, appellants here, seek in this suit to recover a portion of the property of the Harmony Society, which they allege is defunct, and claim that its property ought to be distributed among those entitled thereto. In the year 1803, George Rapp and his son John, and several of their friends, left the kingdom of Wurtemberg, came to the United States, and located at a place called Harmony, in Butler county, Pa., where they were joined by a considerable number of other emigrants. They remained there until the year 1814, when they removed to Posey county, Ind., where they remained until the year 1825, when, becoming dissatisfied, they moved back to Pennsylvania, and located at Economy, in Beaver county, Pa., where they ever since have resided. They formed a society or an association called the "Harmony Society," and in 1805 they made the first written contract between them. The said society was organized upon the principle of community of goods and land ownership. The members of the said society who had brought with them from Wurtemberg money combined their funds, and held all their property in common, they living as members of a common household, and each member enjoying alike with every other the fruits of their common labor in equality and brotherhood. The occupation or business of said society was agriculture, except in so far as it was necessary to manufacture shoes, clothing, and other necessaries for the community. The members of said society obeyed George Rapp as their spiritual and temporal leader and ruler. The only laws or rules governing said society were made by him, the members thereof having no voice in their enactment. About the year 1807 the community promulgated the doctrine of celibacy as being necessary for the success of a communistic society. The agreement of 1805 (Exhibit A, p. 47, vol. 1, Record) is as follows:

"Be it hereby known to all who need to know that the following agreement has this day been made and concluded between us, the subscribers of the one part, and George Rapp and his associates, of the other part:

"Article 1. We, the subscribers, on our part, and on the part of our heirs and descendants, deliver up, renounce, and remit all our estate and property, consisting of cash, land, and chattels, or whatever it may be, to George Rapp and his associates, in Harmony, Butler county, Pennsylvania, as a free gift or donation, for the benefit and use of the community there, and bind ourselves on our part, as well as on the part of our heirs and descendants, to make free renunciation thereof, and to leave the same at the disposal of the superintendents of the community, as if we had never had nor possessed it.

"Art. 2. We do pledge ourselves jointly and severally to submit to the laws and regulations of the community, and to show due and ready obedience towards those who are appointed and chosen by the community as superintendents in such manner that not only we ourselves endeavor, by the labor of our hands, to promote the good and interest of the community, but also to hold our children and families to do the same.

"Art. 3. If, contrary to our expectation, the case should happen, and we jointly or severally could not stand to it in the community, and we would within a few or more years break our promises, and withdraw from the community, for whatever cause it may be, never to demand any reward, either for ourselves or children, or those belonging to us, for any of our labor or services rendered, but whatever we jointly and severally shall or may do we will have all done as a voluntary service for our brethren. In consideration whereof George Rapp and his associates adopt the subscribers jointly and severally as members of the community, whereby each of them obtains the privilege to be present at each religious meeting; not only they themselves, but also their children and families, shall and will receive the same necessary instructions in church and school which is needful and requisite for their temporal, good and welfare as well as eternal felicity.

"Art. 4. George Rapp and his associates promise to supply the subscribers jointly and severally with all the necessaries of life, as lodging, meat, drink, and clothing, etc., and not only during their healthful days, but also when one or more of them become sick, or otherwise unfit for labor, they shall have and enjoy the same support and maintenance as before; and if, after a short or long period, the father or mother of a family should die, or be otherwise departed from the community, and leave a family behind, they shall not be left widows or orphans, but partake of the same rights and maintenances as long as they live or remain in the community, as well in sick as healthful days, the same as before, or as circumstances or necessity may require.

"Art. 5. And if the case should happen, as stated above, that one or more of the subscribers, after a short or long period, should break their promise and could or would not submit to the laws and regulations of the church or community, and for that or any other cause would leave Harmony, George Rapp and his associates promise to refund him or them the value of his or their property brought in, without interest, in one, two, or three annual installments, as the sum may be, large or small; and if one or more of them were poor, and brought nothing in the community, they shall, provided they depart openly and orderly, receive a donation in money, according to his or their conduct while a member, or as he or their circumstances and necessities may require, which George Rapp and his associates shall determine at his or their departure.

"In confirmation whereof, both parties have signed their names.

"Done in Harmony, February 15, 1805."

They became the owners of about 7,000 acres of land at Harmony, Butler county, which, on May 6, 1815, was conveyed by Frederick Rapp, as their attorney in fact, to Abraham Ziegler, for the consideration of $100,000. And in that year, or in 1814, the society removed from Butler county, Pa., to Posey county, state of Indiana, where, in 1821, a second agreement with each other, in German, was entered into by them. In 1825 the society removed from Indiana to Beaver

county, Pa., where they purchased and settled upon a tract of land containing about 3,000 acres, now known as "Economy," where they have since remained, and which has since become very valuable, and on which they have erected many buildings, including dwellings and factories of various kinds, and made many valuable improvements. After the settlement at Economy, in 1827, another agreement was entered into and signed by all the then members of the association. This agreement is substantially the same as the agreement of 1805, in so far as it relates to the rights and duties of the members of the society. It had, however, in it a stipulation, constituting the sixth article, that the society would refund to any members who for any reason should withdraw therefrom "the value of all such property as he or they may have brought into the community, in compliance with the first article of this agreement." And if the persons withdrawing were poor, and brought nothing into the community, they should, nevertheless, receive a donation of money according to the length of their stay, and to their conduct and necessities, in the judgment of the superintendent of the association. In 1836, owing to troubles occasioned by a secession of members, it was deemed wise to abrogate this article, and accordingly an agreement supplementary to that of 1827 was entered into by all of the then members of the community, in which "the principle of restitution of property" was, for reasons stated, renounced, and the said sixth article of the agreement of 1827 was expressly and entirely "annulled and made void as if it had never existed"; all other articles remaining "in full force as heretofore." This supplementary agreement then provided as follows:

"(2) All the property of the society, real, personal, and mixed, in law or equity, and howsoever contributed or acquired, shall be deemed now and forever joint and indivisible stock. Each individual is to be considered to have finally and irrevocably parted with all his former contributions, whether in land, goods, money, or labor; and the same rule shall apply to all future contributions whatever they may be. (3) Should any individual withdraw from the society, or depart this life, neither he, in the one case, nor his representatives in the other, shall be entitled to demand an account of said contributions, whether in land, goods, money, or labor, or to claim anything from the society as matter of right. But it shall be left altogether to the discretion of the superintendent to decide whether any, and, if any, what, allowance shall be made to such member or his representatives as a donation."

After the death of George Rapp, in 1847, and in that year, another agreement was entered into by the then members of the society, confirming the agreements of 1827 and 1836, except so far as the same were affected by the death of the said George Rapp, and providing for a different scheme of administration. The executive powers, which had theretofore been mainly exercised by the said Rapp, were vested in a board of nine elders, to be chosen as therein provided. The agreements of 1827, 1836, and 1847 are those under which, or some of which, the plaintiffs claim the right to share in the property and assets of the society, as heirs of former members. The bill alleges that the complainants were heirs and next of kin of those who either were members of the society, and withdrew from the same before the execution of the agreement of 1836, or of those dying in the society before that time, or of those who died members of the society after having

joined in the agreements of 1836 and 1847. The bill alleges that the defendant John Duss, with others, entered into a conspiracy, on more than one occasion, to wreck the society, and take to himself and his co-conspirators the property and assets of the same. The bill further alleges that there had been, prior to and up to the time of the filing of the bill, such an abandonment by the defendants, constituting the present membership of the society, of the principles and purposes upon which and for which the said society was founded, as to work a dissolution of the same. The complainants therefore contend that, such being the case, the present property of said society reverts to the complainants and such others as were heirs at law and next of kin of those who contributed and gave to the said society its property. To support the charge of abandonment of the purposes of the society, various specific allegations are made concerning the alleged immorality of John Duss and others of the defendants, of the intemperance alleged to prevail among them, and the alleged renunciation of the religious principles generally upon which the society was founded. In view of the findings of the master, hereinafter referred to, it is unnecessary to consider these allegations in detail. After the cause was at issue, upon the agreement and request of the parties, the court below appointed W. W. Thompson, Esq., as examiner and master, with authority to hear and take all the testimony, and find all the issues of fact and law, and to report the testimony and such findings to the court. In pursuance of this appointment, a great amount of testimony was adduced by the parties and taken by the examiner, who returned the same to the court below, together with a long and most elaborate report, embodying his findings, as master, of the facts and conclusions of law arising thereon. To these findings of the master exceptions were duly taken and filed, and argued before the court below. That court, after hearing the case upon the pleadings and evidence, the master's report, and the exceptions thereto, made a decree dismissing the complainants' bill. From this decree an appeal has been taken to this court, and numerous exceptions have been filed. But it is only necessary to consider the two underlying questions. These are succinctly and correctly stated by the master, in his report, as follows:

"First. Have the plaintiffs, or any of them, such a proprietary right or interest in the property and assets of the Harmony Society as entitled them, upon the dissolution of the society, to any part of or share in such property or assets, or as entitled them to the account prayed for in the bill? Second. Has the Harmony Society been dissolved by the common consent of the members, or by an abandonment of the purposes for which it was formed?"

These obviously fundamental and determining questions have been most ably discussed by the master in the light of the testimony and documentary evidence, all of which, together with the master's report, are contained in the record before this court. The findings of fact by the master bearing on the first of these questions, were as follows:

"(1) That none of the plaintiffs were ever members of the society. (2) That all of those members of the society through whom Christian Schwartz claims as their heir signed the agreements of 1836 and 1847, and continued members until their death. (3) That Anthony Koterba claims as heir of his father, Joseph Koterba, and his half-brother, Andreas Koterba; and that Joseph Koterba joined in the organization of the society, and also signed the agreement

of 1827. and afterwards, in 1827, withdrew from the society: and that Andreas Koterba signed the agreements of 1827, 1836, and 1847, and died a member of the society. (4) That the grandparents of David Strohaker, viz. Christian Strohaker and wife, and Matthias Rief and wife, joined the society in 1805, and all remained members until their death; all dying between 1820 and 1825. except Mrs. Rief, who died between 1830 and 1836. That his father, Christian Strohaker, signed the agreement of 1827, and withdrew from the society in 1827. That his aunt, Catharina Strohaker, signed the agreements of 1827. 1836, and 1847, and continued a member of the society until her death. (5) That Lawrence Scheel and Jacob Scheel, ancestors of Allen and G. L. Shale, joined the society in 1805. That Lawrence withdrew in 1824 or 1826. That Jacob Scheel signed the agreement of 1827. and died, a member, about 1837. (6) That none of the parties through whom the plaintiffs claim contributed any money or property to the society."

As a conclusion of law upon the facts thus found, the master reports:

"The plaintiffs, therefore, under their agreements, have no claim on the property of the society through any of their ancestors. Not through those who withdrew before the execution of the agreement of October 31, 1836, because those who withdrew had had returned to them the value of any property they might have contributed, and had received the compensation for their interest or part in the society or its property. Not through those who died in the society before 1836, because all their interest in the property had become vested in the society, and did not descend to their heirs. And not through those who died in or withdrew from the society after the agreement of 1836, because they had by that agreement expressly renounced for themselves and their heirs all right to claim anything on their withdrawal or death. In all the cases cited above the principle of survivorship in the remaining or surviving members was recognized as existing, and approved and enforced."

As a mixed finding of fact and of law, the master, for reasons set out at great length in his report, answers the second question above stated as follows:

"That there has been no abandonment of the purposes for which the Harmony Society was founded, and that the said society has not been dissolved by reason of any such abandonment, and that the plaintiffs are not entitled to the relief prayed for in the bill."

The report ends with a recommendation by the master that the bill of complainants be dismissed, with costs.

Where the court, with the consent and by the agreement of parties, appoints a master, and confers upon him "authority to hear and take all the testimony, and find all the issues of law and fact," as in this case, in so far as the report of the master and the opinion of the court find facts, such findings are considered as conclusive in this court, unless plain error be unmistakably shown from the great preponderance of evidence in the case. Bank v. Rogers, 3 C. C. A. 666, 53 Fed. 776; Kimberly v. Arms, 129 U. S. 525, 9 Sup. Ct. 355, 32 L. Ed. 764; Dravo v. Fabel, 132 U. S. 487, 10 Sup. Ct. 170, 33 L. Ed. 421. The findings of fact made by the master were confirmed by the court below. The learned judge of that court, in his opinion, states that he read all the testimony in the case, in order to come to an independent conclusion, and that the conclusion so arrived at agreed entirely with that reported by the master. Such finding by the master and by the court, unless found by this court to be unmistakably and plainly erroneous, will be binding here, and will determine this case adversely to the complainants, and make unnecessary any examination of the ques-

tions of law that might have been involved upon different findings of fact. A careful examination of the testimony and evidence contained in the record before us not only fails to make manifest any such plain and unmistakable error in these findings, but convinces this court that they were in all respects justified. The learned judge in the court below has so completely covered all the questions of law and fact arising in this case, and necessary to its determination, that we feel constrained to adopt as our own his opinion, as we find the same in the record, part of which we here repeat as follows:

"The plaintiffs sue as heirs of certain persons who were formerly members of the Harmony Society, and who continued to be members until their voluntary withdrawal or death. The bill is against all the persons who composed the society at the commencement of the suit, namely, June 27, 1894, the membership then embracing 16 persons. The bill joins as co-defendants with the members of the Harmony Society, Henry Hice, John Reeves, and the Union Company, a corporation, the bill charging that these three defendants and the defendant John S. Duss, a member of the society, and the senior trustee thereof, were acting together in a conspiracy to wreck and dismember the society, and appropriate to themselves the entire assets of the society. The bill further alleges that all the purposes for which the society was founded and its established practices had been abandoned, and that by common consent the society had ceased to exist as an association, and had been dissolved, and that 'the assets of such dissolved association have reverted to the donors thereof, among whom were the ancestors and intestates of the plaintiff.' The bill prays for the appointment of a receiver, and for the division and distribution of the assets of the society amongst the persons legally entitled thereto, including the plaintiffs. All the defendants have answered the bill. In their answers they all deny the above recited charges and allegations, and all the averments in the bill upon which the plaintiffs' supposed right to relief rests; and they also deny that the plaintiffs have any interest whatever in the property of the Harmony Society, or any right to intermeddle with its affairs. * * * In conformity with the agreement of the parties, and pursuant to the order appointing him, the master took a large amount of testimony, and made findings which are embodied in a written report to the court. The master filed with his report the testimony and exceptions taken by the plaintiffs to his findings. The cause has been heard upon the pleadings and evidence, the master's report, and the exceptions thereto. The report of the master is altogether adverse to the plaintiffs. He finds that the charges of conspiracy and misconduct and the allegations of abandonment of the purposes and established practices of the Harmony Society and of the dissolution of the society, contained in the bill, are not sustained by the evidence, and that they are not true. Upon every material question of fact the finding of the master is distinctly in favor of the defendants, and he recommends the dismissal of the bill. The master's report covers the entire case, and evinces the most careful consideration of every question here raised. Nevertheless the court has felt it to be its duty to make an independent investigation of the facts and merits of the case, and therefore we have attentively read and considered the whole of the evidence. Avoiding, as needless, a particular discussion of the numerous exceptions to the master's report, we will briefly state our general views and conclusions.

"The constitution of the Harmony Society is embodied, and the general purposes of the association are set forth, in a series of written agreements executed in the years 1805, 1821, 1827, 1836, 1847, and 1890. These agreements were signed at their respective dates by all the then members of the society. By the agreement of 1805 the doctrine of community of property became, and by the subsequent agreements continued to be, a fundamental principle of the society. Its acceptance is an essential condition of membership. By the constitution of the society, individual ownership of property is renounced in favor of the community or society. The members have all things in common, and each is entitled to receive from the society necessary mainte-

nance, support, and education, and in return each is bound to render to the society labor and obedience. The agreement of 1827 contained a provision that, if any member withdrew from the society, there should be refunded to him the value, without interest, of all the property he had brought into the community. The agreement of 1836, however, rescinded that provision wholly, and stipulated that, if any individual shall withdraw from the society, or depart this life, neither he in the one case, nor his representatives in the other, shall be entitled to demand an account of his contributions, whether in lands, goods, money, or labor, or to claim anything from the society as matter of right; but that it shall be left altogether to the discretion of the superintendent to decide whether any, and, if any, what, allowance shall be made to such member or his representatives as a donation. In view of the decision of the supreme court of Pennsylvania in Schriber v. Rapp, 5 Watts, 351, and the decisions of the spureme court of the United States in Goesele v. Bimeier, 14 How. 589, 14 L. Ed. 554, and Baker v. Nachtrieb, 19 How. 126, 15 L. Ed. 528, it is clear that the above-recited articles of agreement are valid contracts, and that thereunder, upon the death of a member of the society in fellowship, no claim enforceable against the society or its property passes to his heirs or personal representatives, and that since 1836 no member voluntarily withdrawing from the society could acquire any such claim. Now, not one of the plaintiffs was ever a member of the Harmony Society. Furthermore, it does not appear that any of the persons through whom the plaintiffs claim contributed any money or property to the society. The master has found that no such contribution was ever made by any of those persons. The correctness of that finding has not been impeached. All the members through whom the plaintiffs claim who left the society withdrew in or before the year 1827. Presumably they retired upon terms satisfactory to themselves. If, however, those persons so withdrawing had any legal demands against the society, those demands have been barred by lapse of time. Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718. The other persons through whom the plaintiffs claim remained with the society, and died in fellowship. They thus received and enjoyed all the benefits secured to them by the recited articles of agreement, and therefore no rights enforceable against the society passed from them to their heirs or personal representatives. The soundness of the view that the deceased ancestors and the collateral relatives of the plaintiffs could transmit to them no rights enforceable against the Harmony Society as a living organization is impliedly conceded by the bill, for it alleges that the society had come to an end. The bill proceeds upon the theory that a dissolution of the society had been brought about. Upon this assumption, and under the allegation 'that recently said Harmony Society has become dissolved as aforesaid,' the bill prays that the court take charge of the assets of the society, and distribute the same amongst the parties legally and equitably entitled thereto. But the hypothesis of dissolution is not well founded. The proofs' show that the society is in full life. There has been no dissolution of the society, either by the common consent of the members or by their acts. The membership, indeed, has become greatly reduced, but the rights of the society, as now constituted, are as sacred in the eye of the law as they were when the membership was twentyfold greater. The society as an organization exists in law and in fact. Under the evidence, the findings of the master upon this branch of the case undoubtedly are right. Hence the very foundation of the bill fails. The plaintiffs do not show that they are entitled to any equitable relief whatever. It is not necessary, nor would it be proper, for the court to express any opinion as to what would be the legal status and the ultimate disposition of the property of the Harmony Society were its existence terminated by the death of all its members, or were a dissolution of the society otherwise effected. No such questions are before us. We are not dealing with the assets of a defunct or dissolved association. In respect to the alleged conspiracy to wreck and dismember the Harmony Society, we feel called upon to say that we fully agree with the conclusion of the master. The acts here principally complained of were, we think, designed, not to destroy the society, but to save it from the consequences of business mistakes made by none of the present officers or members of the society, and for which none of them are at all responsible. The measures resorted to in the emergency which was upon the

society were successful in extricating it from great financial peril. Those measures were adopted and carried out under the advice of eminent counsel, whose rectitude of purpose the court cannot doubt. And now, before closing, we deem it to be our duty to declare that, after the most careful scrutiny of the evidence, it is our judgment that the charges of immorality made against John S. Duss, the senior trustee, in the twenty-fourth paragraph of the bill, are not sustained by the evidence, but are disproved. The general rule in equity that costs follow the decree, we think, should be applied here, under the circumstances. Swentzel v. Bank, 147 Pa. St. 140, 154, 23 Atl. 405, 415, 15 L. R. A. 305. The bill alleges conspiracy, fraud, and immorality, and these grave charges have not been withdrawn. Having successfully vindicated themselves from these charges, the defendants are justly entitled to full costs."

The decree of the court below dismissing the bill is affirmed.