EVERITT et al. v. DUSS et al.†

(Circuit Court of Appeals, Third Circuit. June 20, 1913.)

No. 1,717.

ASSOCIATIONS (§ 25*)—COMMUNISTIC SOCIETY—DISSOLUTION—RIGHTS OF HEIRS OF DECEASED MEMBER.

About 1805 the Harmony Society, a religious and communistic association, was formed in Pennsylvania; George Rapp being the leader. From time to time articles of agreement were signed by the members which constituted the constitution of the society and by which each member and any one subsequently subscribing thereto surrendered his property into one common stock for the mutual benefit of all during their joint lives. They further provided that a withdrawing member, or the heirs of a deceased member, should not be entitled to anything from the society as matter of right, but might be given an allowance as a donation in the discretion of the governing body. Title to all property of the society was vested in trustees, who were given power by instruments duly recorded to buy, sell, and convey the same. In 1847, Rapp died intestate, leaving a daughter and granddaughter, both of whom died without issue, having remained members of the society. The granddaughter, who died last, made a will by which she bequeathed any interest she might have in the community property to the society, to be held under the articles of association. In 1905, the society was voluntarily dissolved and the prop-

erty was divided between the remaining members. Thereafter complainants, claiming to be the next of kin of George Rapp, brought suit to recover an interest in the property by virtue of some right remaining in Rapp as founder of the society. *Held*, that the suit could not be maintained. because: (1) There was no evidence to show how much, if any, property was contributed by him; and (2) if he had any right of property. contingent or otherwise, capable of transmission, it became at his death subject to the intestacy laws of the state and passed to his daughter and granddaughter as his next of kin, and afterwards to his granddaughter alone, and was disposed of by her will, in which complainants have no beneficial interest.

[Ed. Note.—For other cases, see Associations, Cent. Dig. § 47; Dec. Dig. § 25.*]

Appeal from the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, District Judge.

Suit in equity by Ada J. Everitt and another against John S. Duss and another. Decree for defendants, and complainants appeal. Affirmed.

For opinion below, see 197 Fed. 401.

Franklin T. Nevins, of Pittsburgh, Pa., Charles E. S. Simpson, of Jersey City, N. J., and John Cadwalader, Jr., of Philadelphia, Pa., for appellants.

Agnew Hice, of Beaver, Pa., and H. F. Stambaugh and D. T. Watson, both of Pittsburgh, Pa., for appellees.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

J. B. McPHERSON, Circuit Judge. Early in the nineteenth century a company of German immigrants organized a community in the western part of Pennsylvania that bore several names at one time or another but in the end was commonly called the Harmony Society. It was based upon certain religious and certain economic beliefs, and for a time prospered exceedingly. Afterwards it dwindled and came to know adversity, but it lasted for 100 years, and did not come to an end until 1905. The two plaintiffs, Ada Everitt and Louisa Tryon, never were members, and contributed nothing to its assets, either in money or other property, or in services. For the purposes of this case we shall assume them to be among the next of kin of George Rapp, who was the originator and one of the earliest members; their claim to share in the assets undoubtedly rests upon George Rapp's relation to the society and to its property. That the plaintiffs are not solitary in their claim of kinship will appear by turning to George Rapp's Est., 12 Pa. Co. Ct. R. 609. Judge Wickham's opinion (delivered in 1893) refuses for the second time the application of 109 similar claimants, who were then asking the register of Beaver county to grant letters of administration to them upon George's estate. Their previous application had been refused in 1885.

In a sense Rapp was the founder of the society; that is, he was the first among its members to be dominated by the underlying religious and economic ideas that were afterwards adopted; he propagat-

ed these ideas with zeal, he convinced others of their truth, he persuaded the converts to try them in practice, and there is no doubt that he. was. by common consent the trusted and venerated leader of the arduous experiment. Apparently also his supremacy was complete; perhaps it may sometimes have been autocratic, but although it did not always pass unchallenged it continued with little dispute or abatement during the 40 years that preceded his death. But in another sense—the sense that is more important in the present inquiry—no one knows who was the founder of the society; that is, who was the person (if there was only one) that furnished the money to give it the needed start, to buy its home in Pennsylvania, to begin its equipment, and to establish and sustain its membership while they were taking the first painful steps in an untried path. In this sense there is little evidence worth considering that George Rapp was the founder; almost certainly, he was not the only original giver, and there is nothing to point him out as better furnished for beneficence than others of the early members. As will be seen in a few moments, this lack of evidence is not accidental; the members themselves deliberately destroyed such writings as might have disclosed the persons of the first givers and the size of the respective gifts. The only evidence concerning Rapp's financial ability that has been laid before us is the so-called "passport" dated April 7, 1804. This paper was executed by certain officials in Würtemberg, and makes several declarations concerning the personal status of George Rapp and his family. It is entitled "Geburtsbrief," describes itself as "an authenticated certificate of his legitimate birth and freedom from bondage," and among other statements contains the following: "With regard to his property the same amounts to 2000 fl. two thousand gulden." This sum we understand to have been the equivalent of, say, $800; and, if we suppose that all his "property" was in cash, the utmost effect that can be given to the statement is that in April, 1804, George Rapp was the possessor in Germany of $800. What he did with this sum, we have no means of knowing; there is not a scrap of evidence to show how much, if anything, was spent out of it for the expenses of the voyage, or to show how much, if anything, was used in the purchase of land or in supplying other early needs of the society. Nearly all we can affirm with confidence is that George Rapp was in the United States in 1804—perhaps having been here before—that other persons came with him or followed him, and that in February, 1805, the following fundamental agreement was entered into and signed by all the persons then engaged in the common enterprise (how many signers there were, we do not find in the record, but the plaintiffs' brief says [page 2] that "a large number of persons" were induced to emigrate before 1805):

"Be it hereby known to all who need to know it, that the following agreement has this day been made and concluded between us, the subscribers of the one part and George Rapp and his associates of the other part:

"Article 1. We the subscribers, on our part and on the part of our heirs and descendants, deliver up, renounce and remit all our estate and property consisting of cash, land and chattels, or whatever it may be, to George Rapp and his associates, in Harmony, Butler county, Pennsylvania, as a free gift or donation, for the benefit and use of the community there, and bind ourselves on our part, as well as on the part of our heirs and descendants, to

make free renunciation thereof, and to leave the same at the disposal of the superintendents of the community as if we never had nor possessed it.

"Art. 2. We do pledge ourselves jointly and severally to submit to the laws and regulations of the community, and to show due and ready obedience toward those who are appointed and chosen by the community as superintendents in such a manner that not only we ourselves endeavor, by the labor of our hands, to promote the good and interest of the community, but also to hold our children and families to do the same.

"Art. 3. If, contrary to our expectation, the case should happen, and we jointly or severally could not stand to it in the community, and we would within a few or more years break our promises, and withdraw from the community, for whatever cause it may be, never to demand any reward, either for ourselves or children, or those belonging to us, for any of our labors or services rendered, but whatever we jointly and severally shall or may do we will have all done as a voluntary service for our brethren.

"In consideration whereof George Rapp and his associates adopt the subscribers jointly and severally as members of the community, whereby each of them obtains the privilege to be present at each religious meeting; not only they themselves, but also their children and families, shall and will receive the same necessary instructions in church and school which is needful and requisite for their temporal good and welfare as well as eternal felicity.

"Art. 4. George Rapp and his associates promise to supply the subscribers jointly and severally with all the necessaries of life, as lodging, meat, drink and clothing, etc., and not only during their healthful days, but also when one or more of them become sick or otherwise unfit for labor, they shall have and enjoy the same support and maintenance as before, and if, after a short or long period, the father or mother of a family should die, or be otherwise departed from the community and leave a family behind, they shall not be left widows or orphans, but partake of the same rights and maintenance as long as they live or remain in the community, as well in sick as healthful days, the same as before, or as circumstances or necessity may require.

"Art. 5. And if the case should happen as stated above, that one or more of the subscribers after a short or long period, should break their promise and could or would not submit to the laws and regulations of the church or community, and for that or any other cause would leave Harmony, George Rapp and his associates promise to refund him or them the value of his or their property brought in, without interest, in one, two or three annual installments, as the sum may be, large or small; and if one or more of them were poor and brought nothing in the community they shall, provided they depart openly and orderly, receive a donation in money, according to his or their conduct while a member, or as he or their circumstances and necessities may require, which George Rapp and his associates shall determine at his or their departure.

"In confirmation whereof both parties have signed their names.

"Done in Harmony, February 15, 1805."

The home of the society thus constituted was in Butler county, Pa., and within a few years its membership became respectable in number, and its landed property grew to be respectable in size. For in June, 1814, more than 400 persons, who describe themselves as "members of the Association of Harmonie and the villages thereto appurtenant, commonly known by the name George Rapp and associates," signed a power of attorney in which they declare that they are "desirous of selling all the real property and estate whatsoever belonging to or claimed, and in the tenure and occupation, of us or either of us, or of the said George Rapp and associates, * * * containing by estimate 9,000 acres, be the same more or less"; and they empower Frederick Rapp to sell and convey all or any part of the estate. About this

time or shortly afterwards the society migrated to Indiana, where another article of agreement was entered into on January 20, 1821:

"Be it hereby known that to-day (20th January, 1821) in the year of our Lord one thousand eight hundred and twenty-one, the present agreement, treaty and alliance was made and concluded between us, the following persons, to wit, N. N., etc., of the one part and George Rapp and his association of the other part.

"After the aforesaid persons became sufficiently acquainted with the principles, rules and regulations of the community of George Rapp, and his association, by virtue of their religious principles, they have after long and mature reflection, out of their own free will, determined to join the community of said George Rapp and his association, in Harmony, Posey county, state of Indiana; to that purpose the aforesaid persons bind themselves and promise solemnly by these presents to comply with the ordinances, rules and regulations of the community and render due obedience to the superintendents ordained by the community, and to perform as much as possible all occupations and labors to which they are ordered, and help to promote the benefit, happiness and prosperity of the community. And if the case should happen that the aforesaid persons, jointly or singly after a short or long period of time, leave the community for any cause whatever, they hereby bind themselves jointly and each for himself separately never and in no case to bring any account, nor make any claim, either against the association or any individual member thereof, for their labor and services rendered; also, never to make any demand, ask or claim any other payment, under any name and description whatsoever, but will do and have done all things out of Christian love for the good and benefit of the community, or else take it as a gift if George Rapp and his association willingly give them something.

"However, George Rapp and his association in return adopt the aforesaid persons into their community, whereby they obtain prerogative to partake of all meetings for divine services, by which they receive in church and school the necessary instructions, requisite and needful for their temporal benefit and happiness and eternal felicity. George Rapp and his association bind themselves further to supply the aforesaid persons with all the wants and necessaries of life, to wit, meat, drink and clothing, etc., and indeed not only during their healthful days, but also if all or any of them get sick or otherwise infirm and unable to work, they shall, as long as they remain members of the community, receive and enjoy the same support as before, during their better days, or as their circumstances may require.

"In confirmation of the presents we, both parties, have hereunto set our hands and seals. Done in Harmony the day and year above stated."

In May, 1824, having apparently become dissatisfied with their new home in what was then the far West, "the undersigned persons, members of an association of Harmony, Ind., commonly known by the name of George Rapp and associates," as owners of real and personal property in Indiana and Illinois, executed another power of attorney to Frederick Rapp to sell or otherwise dispose of their property—evidently in view of the society's contemplated return to Pennsylvania. This was accomplished soon afterwards, for in 1827 we find them again in Pennsylvania (this time in the county of Beaver, where they remained to the end), and there is now a membership larger than 500. In March of that year they executed another set of articles, declaring the purposes of the society, and defining "the rights and privileges and duties of every individual therein":

"Whereas, by the favor of Divine Providence, an association or community has been formed by George Rapp and many others upon the basis of Christian fellowship, the principles of which being faithfully derived from the sacred Scriptures includes the government of the patriarchial age, united to the community of property and adopted in the days of the Apostles, and wherein the

single object sought is to approximate, as far as human imperfection may allow, to the fulfillment of the will of God, by the exercise of those affections, and the practice of those virtues which are essential to the happiness of man in time and throughout eternity;

"And whereas, it is necessary to the good order and well-being of said association, that the condition of membership should be clearly understood, and that the rights and privileges and duties of every individual therein should be so defined as to prevent mistake or disappointment on the one hand and contention or disagreement on the other:

"Therefore, be it known to all whom it may concern: That we, the undersigned citizens of Beaver county, in the commonwealth of Pennsylvania, do severally and distinctly, each for himself, covenant, grant and agree to and with the said George Rapp and his associates as follows, to wit:

"Article 1. We, the undersigned, for ourselves, our heirs, executors and administrators, do hereby give, grant and forever convey to the said George Rapp and his associates and their heirs and assigns, all our property, real, personal and mixed, whether it be lands and tenements, goods and chattels, money or debts due to us, jointly or severally, in possession, or in remainder, or in reversion, or in expectancy, whatsoever or wheresoever, without evasion or qualification, or reserve, as a free gift or donation, for the benefit and use of the said association or community; and we do hereby bind ourselves, our heirs, executors and administrators to all such other acts as may be necessary to vest a perfect title to the same in the said association, and to place the said property at the full disposal of the superintendents of the said community without delay.

"Art. 2. We do further covenant and agree to and with the said George Rapp and his associates that we will severally submit faithfully to the laws and regulations of the said community, and will at all times manifest a cheerful and ready obedience toward those who are or may be appointed as superintendents thereof, holding ourselves bound to promote the interests and welfare of the said community, not only by the labor of our own hands, but also that of our children or families and others who now are or hereafter may be under our control.

"Art. 3. If, contrary to our expectations, it should so happen that we could not render the faithful obedience aforesaid, and should be induced from that or any other cause to withdraw from the said association, then and in such case we do expressly covenant and agree to and with the said George Rapp and his associates that we will never claim or demand either for ourselves, our children, or for any one belonging to us, directly or indirectly, any compensation, wages or reward whatever, for our or their labor or services rendered to the said community, or to any member thereof; but whatever we or our families jointly or severally shall or may do all shall be held and considered as a voluntary service for our brethren.

"Art. 4. In consideration of the premises, the said George Rapp, and his associates, do by these presents adopt the undersigned, jointly and severally, as members of the said community, whereby each of them obtains the privilege of being present at every religious meeting, and of receiving not only for themselves, but also for their children and families, all such instructions in church and school as may be reasonably required, both for their temporal good and for their eternal felicity.

"Art. 5. The said George Rapp, and his associates further agree to supply the undersigned severally with all the necessaries of life, as clothing, meat, drink, lodging, etc., for themselves and their families; and this provision is not only limited to their days of health and strength but when any of them shall become sick, infirm, or otherwise unfit for labor, the same support and maintenance shall be allowed as before, together with such medicine, care and attendance and consolation as their situation may reasonably demand. And if at any time after they have become members of the association the father or mother of a family should die or be otherwise separated from the community, and shall leave their family behind, such family shall not be left orphans or destitute, but shall partake of the same rights or maintenance as before so long as they remain in the association, as well in sickness as in health, and to such extent as their circumstances may require.

"Art. 6. And if it should happen as above mentioned that any of the under-signed should violate his or her agreement and would or could not submit to the laws and regulations of the church or community, and for that or any other cause should withdraw from the association, then the said Geroge Rapp, and his associates, agree to refund to him or them the value of all such property as he or they may have brought into the community in compliance with the first article of this agreement, the said value to be refunded without interest in one, two or three annual installments, as the said George Rapp and his associates shall determine. And if the person or persons so with-drawing themselves were poor, and brought nothing into the community, notwithstanding if they depart openly and regularly, they shall receive a dona-tion in money, according to the length of their stay, and to their conduct, and to such an amount as their necessities may require, in the judgment of the superintendents of the association.

"In witness whereof, and in testimony that the undersigned have become members of the said community, upon the conditions aforesaid, they have hereunto severally and each for himself set their hands and seals on the 9th day of March, in the year 1827."

A few years afterward, probably in 1832, trouble and dissension sprang up and a secession from the society took place, one result of which was the payment of more than $100,000 to the seceders, the Count De Leon and his associates. Perhaps as a result of this expe-rience, a supplementary article was entered into in October, 1836, and this was signed by the 391 members then remaining:

"Whereas, the Harmony Society, consisting of George Rapp and many oth-ers, now established in the town of Economy, in Beaver county, Pennsylvania, did, on the 9th of March, 1827, enter into certain articles of association of which the sixth in number is as follows, viz.:

"'And it would so happen as above mentioned, that any of the under-signed should violate his or their agreement, and would or could not submit to the laws and regulations of the church or community, and for that or any other cause should withdraw from the association, then the said George Rapp and' his associates agree to refund to him or them the value of all such prop-erty as he or they may have brought into the community, in compliance with the first article of this agreement, the said value to be refunded without in-terest in one, two or three annual installments, as the said George Rapp and his associates shall determine.

"'And if any person or persons so withdrawing themselves were poor, and brought nothing into the community, yet if they depart openly and regularly, they shall receive a donation of money, according to the length of their stay and to their conduct, and to such amount as their necessities may require in the judgment of the superintendents of the association.'

"And whereas, the provisions of the said sixth article, though assented to at the time, manifestly depart from the great principle of a community of goods and may tend to foster and perpetuate a feeling of inequality at vari-ance with the true spirit and objects of the association;

"And whereas, the principle of restoration of property, besides its pernicious tendency, is one which cannot now be enforced with uniformity and fairness, inasmuch as the members of the association in the year 1818, under a solemn conviction of the truth of what is above recited, did destroy all record and memorial of the respective contributions up to that time;

"And whereas, continued happiness and prosperity of the association, and a more intimate knowledge of each other have removed from the minds of all members the least apprehension of injustice and bad faith:

"Now, therefore, be it known by these presents, that we, the undersigned, with a view to carry out fully the great principles of our union, and in con-sideration of the benefits to be derived therefrom, do hereby solemnly enter into covenants, and agree with each other as follows:

"First. The said sixth article is entirely annulled and made void, as if it had never existed; all others remain in full force as heretofore.

"Second. All the property of the society, real, personal or mixed, in law or in equity, and howsoever contributed or acquired, shall be deemed now and forever joint and indivisible stock. Each individual is to be considered to have finally and irrevocably parted with all his former contributions, whether in land, goods, money or labor; and the same rule shall apply to all future contributions whatever they may be.

"Third. Should any individual withdraw from the society, or depart this life, neither he, in the one case, nor his representatives in the other, shall be entitled to demand an account of said contributions, whether in land, goods, money or labor, or to claim anything from the society as matter of right. But it shall be left altogether to the discretion of the superintendent to decide whether any, and if any, what allowance shall be made to such member or his representatives as a donation.

"Invoking the blessing of God on this sacrifice of all narrow and selfish feelings to the true purposes of the association and to the advancement of our own permanent prosperity, we have signed the foregoing instrument, and affixed hereunto our respective seals, at Economy, this 21st day of October, 1836.                                                            [Signed by 391 members.]"

All the foregoing writings were signed by George Rapp on a common footing with the other members, and they would be of great, perhaps of conclusive, weight in determining by what title the society held its property, and incidentally what interest (if any) Rapp had therein. To some extent also they have a bearing on the interest of the plaintiffs, although their interest is more decisively affected by other considerations, to be referred to immediately. Rapp died August 7, 1847, intestate, leaving to survive him as his sole heirs and next of kin a daughter Rosina (who died in 1849, intestate, unmarried, and without issue), and a granddaughter, Gertrude Rapp, the only daughter of a deceased son, John Rapp, who thus succeeded (on Rosina's death) to all her grandfather's rights of property. Gertrude was a member of the society, and on August 14, 1847, she joined the other members in signing another set of articles:

"Articles of Association of the Harmony Society, Entered 14th of August, 1847.

"Whereas, by the decree of God, the venerable patriarch and much-beloved founder and leader of the Harmony Society, George Rapp, has departed this life, whereby its members are deprived of his Christian fellowship and religious ministry, and of his superintendence in their temporal affairs, and whereas, in consequence of this deeply afflicting dispensation it has become necessary to the good order and well-being of the association that some plan should be agreed upon to regulate its future affairs, promote its general welfare, and preserve and maintain it upon its original basis:

"Therefore, be it known to all whom it may concern, that we the undersigned, surviving and remaining members of the Harmony Society, and constituting the same, do severally and distinctly, each for himself, covenant, grant and agree to and with all the others thereof, and with those who shall hereafter become members, as follows: That is to say,

"Article 1. We do hereby solemnly recognize, re-establish and continue the articles of our association (the sixth section excepted) entered into at Economy on the 9th day of March, A. D. 1827, in the presence of John H. Hopkins and Charles L. Voltz, and the supplement thereto, adopted at the same place on the 31st day of October, A. D. 1836, in the presence of Charles L. Voltz and William P. Baum, except so far as the same are affected by the death of the said George Rapp, or hereinafter altered or modified, and to this extent we declare the said articles to remain in full force.

"Art. 2. We hereby ordain and establish a Board of Elders, which shall consist of nine members of the Harmony Society and their successors, to be chosen as hereinafter provided: John Stahl, John Schnabel, Adam Nach-

trieb, Matthew Scholle, Joseph Hoerle, John Eberle, Romulus L. Baker, Jacob Henrici, Jonathan Lenz shall be the first board.

"Art. 3. The board of elders shall have and exercise the following powers, to wit: First. To regulate and manage exclusively the internal temporal concerns of the Harmony Society; to appoint and remove superintendents in the several departments of industry; to make regulations and give orders in relation to their business operations, and generally to take care that the members perform the duties assigned to them. Second. To determine all disputes and misunderstandings amongst the members of the society; to advise if necessary, reprove any member who may be in fault or found delinquent in his duty. Third. To admit new members into the society and to expel them therefrom. New members when admitted shall subscribe this agreement as the evidence of their membership, and of the rights acquired by, and the duties imposed upon them. Fourth. To establish regulations for the maintenance and improvement of the morals of the society and for the instruction of its members. Fifth. To appoint one or more of its members spiritual leaders and instructors with such authority in relation to church discipline as shall be conferred by the board. Sixth. To remove from office any members of the board of elders and to declare his seat vacated; also to remove from office either or both of the trustees hereinafter appointed for the management of the external affairs and their successors in office. Seventh. To fill all vacancies in the board of elders occasioned by the death, resignation or removal from office of any of its members and their successors, and so as often as a vacancy shall occur, to fill all vacancies in the office of trustee, when either or both of the trustees or their successors shall die, resign his office or be removed from the same, and so often as a vacancy shall occur. Eighth. The concurrence of six members of the board of elders shall be deemed the act of the board and a legal exercise of any of the powers hereinbefore conferred on the said board. Ninth. A record book shall be kept in which the board of elders shall enter all proceedings that they shall consider of sufficient importance to be preserved. In all controversies, judicial or otherwise, in which the society or any of its members may be a part, such record shall be full and absolute evidence of the facts and proceedings therein contained, and the affirmation of any elder shall be competent evidence of the identity of the said record.

"Art. 4. We do further ordain and establish a Board of Trustees for the exclusive management of the external business and affairs of the society, which board shall consist of two persons, who shall be members of the board of elders, and their successors who shall be appointed as hereinbefore provided. Romulus L. Baker and Jacob Henrici shall be the first board of trustees.

"Art. 5. The said trustees shall jointly and severally have and exercise the powers following, to wit: First. In their own names or that of either of them, or otherwise, to purchase and sell, deal, barter, exchange and traffic, make all contracts and bargains in the prosecution of the business, to invest the funds in stocks and other securities, and make transfers and assignments, to collect debts, receive and pay out moneys, settle claims, compromise disputes, institute legal proceedings, appoint and dismiss agents, clerks and attorneys in fact, and at law, and generally to transact all the external business and affairs of the society. Second. To make donations to seceding and excluded members and to the representatives of those who are deceased, and for such benevolent and charitable purposes as they may deem prudent and fit. Third. The said trustees shall have power jointly to purchase real estate in their own names and also in their joint names, to grant, bargain, sell and convey all or any of the lands and tenements now or hereafter owned by or belonging to the said society, and for this purpose to execute deeds of conveyance in fee simple or otherwise in their joint names, but the proceeds of all such sales shall be held in trust for the society. Fourth. For the purpose of providing an effectual and convenient remedy in law for all injuries to the property of the society, real and personal, by trespass, ouster, detention, conversion or otherwise. The said trustees are hereby invested with the rights of possession, entry and of action in their own names as fully and to all intents and purposes as do and may exist in the said society, and to

effectuate this object more completely and in consideration thereof we grant and transfer to the said trustees all such title and interest in the said property as shall be necessary therefor. The proceeds of all suits to be brought shall be in trust for the society. Fifth. The powers hereby vested in the said trustees shall extend to and embrace all the property of said society, real, personal or mixed, whether standing, or held in the name of the late Frederick Rapp, or said George Rapp, or in any other name or form whatsoever.

"Art. 6. It is hereby distinctly and absolutely declared and provided that all the property, real, personal and mixed, which now or hereafter shall be held or acquired by any trustee or trustees or persons under them, is and shall be deemed the common property of said society, and each trustee now or hereafter appointed hereby disclaims all personal interest in the present resources and future earnings of the society, other than that of a member thereof, according to the articles of association hereby re-established and continued, and according to the present agreement.

"In witness whereof, we, the undersigned members of the Harmony Society, who constitute the said association, have to these articles executed in English and German, hereunto set our hands and seals at Economy, in Beaver county, this 12th day of August, A. D. 1847.

"Read over to and signed and sealed by the several persons whose names are subscribed in the presence of us.                    W. P. Baum and Others."

[Duly acknowledged and recorded.]

So far as appears, no other papers were executed by the members of the society during Gertrude Rapp's lifetime. If her grandfather George Rapp at the time of his death owned any interest whatever, present or future, vested or contingent, in real or personal property, such interest passed in full to her by the intestate laws of Pennsylvania (after Rosina's death) and it was capable of transfer by the foregoing instrument of August, 1847. If that instrument did transfer it, the society thereby became the owner of George Rapp's interest; but, if for any reason his interest was not transferred by the articles of 1847, it continued to belong to Gertrude Rapp, and would inevitably pass at her death either by will or by the intestate law of the state. She decided to make a will, giving as her reason the existence of rumors "that some persons representing themselves to be the heirs of said George Rapp, my grandfather, now make claim to an estate of which they allege he died seised and possessed"; and accordingly on December 2, 1885, she executed the following testamentary instrument:

"I, Gertrude Rapp, of Economy, Beaver county, state of Pennsylvania, daughter of John Rapp, who died at Harmony, Butler county, state aforesaid, and who was the son of George Rapp the founder of the Harmony Society, being of sound and disposing mind, memory and understanding, do declare, will and direct as follows:

"I am a member of the Harmony Society approving of and devoted to its principles, both in spiritual and religious matters, as taught by its founders and members, and in temporal matters, its community of property, and management of its affairs, and therefore do not claim a separate and undivided interest in or right to any part of the property, real or personal, of the said Society, believing that all rights and property of any and every kind that at any time belonged to my grandfather George Rapp, and my father John Rapp, my mother, Joanna Rapp, or any others who were members of the Harmony Society became and is the property of and belongs to said society as such by virtue of the intentions, wishes, acts, transfers and contracts of them the said George Rapp, John Rapp, Rosina Rapp, and the others who were members of the said society, and that therefore no part of the same descended, or came or was intended by them to descend or come to their children or descendants, or those who as collateral relatives might under other circumstances represent them or their heirs. But it having been rumored

that some persons representing themselves to be the heirs of said George Rapp, my grandfather, now make claim to an estate of which they allege he died seised and possessed, and I being his only grandchild, and direct descendant and representative (my father John Rapp, and my aunt Rosina Rapp being the only children of said George Rapp, and she the said Rosina having died unmarried and without issue, and my father John Rapp having died leaving to survive him his widow, Joanna Rapp, my mother, now also dead, and myself, his only child) and therefore entitled to and owner of any and all property or estate of which the said George Rapp may have died seised or possessed, and which for any reason was not or is not fully and legally vested in and belonging to the Harmony Society, and intending and desiring hereby to dispose of any and all property, real or personal, wheresoever the same may be found or situated of which I may die seised or possessed, or which I might at my decease be in any way entitled, from whatever source the same may be derived, do make and publish this my last will and testament, in reference thereto, that is to say: I give, bequeath and devise, to the Harmony Society at Economy, Pennsylvania, of which society Jacob Henrici and Jonathan Lenz are the present trustees, any and all estate, rights and property of every kind real and personal, of which I may die seised or possessed, or to which I may then be in any way entitled, for the use and benefit of said society, in the manner and according to the articles of association or the compact existing between the members of said society, forever. My will and desire being that any and all the estate I may have or leave at my decease shall go to and be enjoyed by those who are the members of the said Harmony Society and who survive me, and be for their joint and common use and benefit, and that of their heirs and assigns forever.

"And lastly, I do hereby nominate, constitute and appoint Jacob Henrici and Jonathan Lenz, of Economy, and members and trustees of said Harmony Society, to be the executors of this my last will and testament, with full power to do, execute and perform any and all acts, matters and things necessary in carrying out and administering what estate I may leave according to the terms hereof.

"In witness whereof, and that the foregoing is my last will and testament, I have hereunto subscribed my hand and seal this second day of December, A. D. eighteen hundred and eighty-five.

"[Duly witnessed.]                                Gertrude Rapp. [Seal.]"

She died in 1889, unmarried and without issue, and the foregoing will was duly proved in Beaver county.

We complete the record by stating what took place after her death. About a year afterwards, 45 persons, declaring themselves to be "the surviving and present members of the Harmony Society at Economy aforesaid and all the present members of said society," executed the following agreement on April 30, 1890:

"Agreement, Ratification and Confirmation of and by the Members of the Harmony Society, at Economy, Beaver County, Pa.   Recorded July 31st, 1890, Deed Book 125, Page 415, Beaver County.

"Whereas, after the death of George Rapp, the founder and leader of the Harmony Society, to wit: On the 12th day of August, A. D. 1847. All the then members of the said society, by articles and a compact in writing of that date, duly executed in Economy, in the county of Beaver, state of Pennsylvania, in the presence of William P. Baum, Francis Le Goulan and Andrew Bimber, and subsequently recorded in the office for recording deeds, in and for the county of Beaver, in Deed Book vol. 25, page 121, etc., adopted and established a system and plan for the regulations and government of the society, the management of their internal affairs, as also for the management and transaction of their external affairs, and business in and by which articles John Schnabel (and 8 others) were appointed and constituted the first board of elders therein established; and Romulus L. Baker and Jacob Hen-

rici, two members of the society and of the board of elders, aforesaid, were therein appointed and constituted the members of the board of trustees of said society; provided for and established, which board of elders as thus constituted, and their successors, duly appointed, under the authority and in the manner therein granted and provided, have managed the internal temporal affairs of the society as therein directed until the present time, the present board of elders being constituted and consisting of Jacob Henrici (and 8 others); and Romulus L. Baker and Jacob Henrici, the trustees aforesaid, and their successors, were in and by said articles authorized and empowered, jointly and severally in their own names, or that of either of them, to make all contracts, purchase and sell, invest the funds of the society, collect debts, receive and pay moneys, compromise and settle claims and disputes, appoint and discharge attorneys in fact and at law, institute and conduct legal proceedings and generally to manage and transact all the external business and affairs of the society, to make donations to withdrawing members and for charitable purposes, etc. Also jointly in their own names to purchase real estate and in their joint names to grant, bargain, sell and convey all or any of the lands, tenements and real estate then or thereafter owned or belonging to the society, and for this purpose to execute deeds of conveyance in fee simple or otherwise, in their joint names, etc., as by reference to said articles recorded as aforesaid will more fully appear;

"And whereas, Romulus L. Baker and Jacob Henrici accepted said trust, acted as trustees of said Harmony Society, managing and transacting their business and affairs under the authority aforesaid, until the death of the said Romulus L. Baker, on the 11th day of January, 1868, whereupon in pursuance of the authority conferred by and according to the terms and provisions of said articles recorded as aforesaid, Jonathan Lenz, a member of said society, and of the board of elders, aforesaid, was duly appointed and constituted a member of the board of trustees, to fill the vacancy occasioned by the death of said Romulus L. Baker, and thereafter the external business and affairs thereof were managed and conducted and transacted by the said Jacob Henrici and Jonathan Lenz as trustees, the same being managed, conducted and transacted under and in accordance with the authority given and conferred by the articles aforesaid until the death of said Jonathan Lenz, on the 21st day of January, 1890, whereupon the board of elders, consisting of the members last hereinbefore named and mentioned as constituting said board, in pursuance of the authority and direction of the articles aforesaid, appointed and constituted Ernest Woelfel (also a member of said society and of said board of elders) a trustee, to fill the vacancy thus occasioned in the said board of trustees, and the said Jacob Henrici and Ernest Woelfel have since that time conducted and transacted the business and affairs of the society according to the terms and provisions of the articles aforesaid;

"And whereas, more than forty years have elapsed since the execution of the articles and compact aforesaid, adopting and establishing the system and plan for the regulation of the government of the internal affairs of the society, and the management, control and transaction of the external business and affairs thereof, and many changes have taken place in the membership of the society, most of the then members having since died, and others embracing part of the undersigned having been admitted and become members thereof in accordance with the terms and provisions of said articles, all of the members of the board of elders, except said Jacob Henrici, designated and appointed in the said articles, having died, as also their successors in said board, and all of whom, as members of said board, managed the internal affairs of the society, as above recited, and two of those who have been members of the board of trustees, and actively engaged in the management and transaction of the external business of the society, under the authority of the articles aforesaid, either severally and in their own names as trustees, or jointly with their cotrustee, Jacob Henrici, still surviving, and in their joint names as such trustees, making contracts, purchasing and selling personal property, investing, collecting, receiving and paying moneys of the society, settling claims, purchasing real estate, selling real estate of the society, exe-

cuting and delivering deeds, assignments, transfers and releases and generally managing and transacting all the external business and affairs of the society, have also since died;

"And whereas said society, and the undersigned, the present members thereof, have received and enjoyed, and do now enjoy, the benefits and advantages resulting from the management and regulation of the internal affairs thereof by the board of elders as aforesaid, as also the benefits and profit of the external business and affairs thereof, managed and transacted by those who constituted the board of trustees as aforesaid, and it is deemed right and proper that we, the undersigned surviving members of the society, who entered into the articles and compact aforesaid, and the others who have since become members as aforesaid, should recognize, approve and reaffirm said articles, and approve and confirm what has been done for and on behalf of the society, under and in pursuance thereof:

"Now, therefore, be it known to all whom it may concern, that we, the undersigned, the surviving and present members of the Harmony Society, at Economy, aforesaid, and all the present members of said society, do severally, and each for himself or herself, covenant, grant and agree to and with the others, and each and all the other members aforesaid, and signers hereof and with those who shall hereafter become and be members as follows, that is to say:

"First. We do hereby solemnly recognize, approve, reaffirm and continue the articles of agreement and compact of our association entered into at Economy, on the 12th day of August, 1847, and recorded in the recorder's office of Beaver county, and set forth in the preamble hereto and declare the same to be in full force, as a whole and all parts thereof, including the agreements and compacts mentioned and designated in the first article thereof, as fully and to the same extent as said mentioned agreements were recognized and established by said first article.

"Second. We do hereby approve and confirm any and all acts, matters and things done and transacted by the board of elders of the Harmony Society, as the same was from time to time constituted. since the date of the articles aforesaid, establishing said board, and we hereby ratify and confirm the appointment of the present board of elders, to wit: Jacob Henrici (and 8 others).

"Third. We do also hereby approve, ratify and confirm all acts, matters and things done, transacted and performed by the board of trustees of the Harmony Society, constituted first of Romulus L. Baker and Jacob Henrici, until January 11th, 1868; afterwards, and from that date until January 21st, 1890, of Jacob Henrici and Jonathan Lenz, and since the last-mentioned date, of Jacob Henrici and Ernest Woelfel, hereby ratifying, confirming, holding, declaring as good and effectual in law and in equity, all acts, matters and things done, transacted and performed by each and all of said trustees in the purchase and sale of personal property, and in the making of contracts, investment of funds, purchase, sale and transfer of stocks, bonds and other securities, loaning or borrowing money, collection and payment of moneys, settlement or compromise of claims or disputes, in the institution and prosecution of legal proceedings, in the employment and discharge of attorneys in fact and at law, in the making of donations, in the purchase of real estate, in the sale thereof, in the execution and delivery of deeds, conveyances, transfers and assignments, whether of and pertaining to real or personal estate, in the execution or delivery of notes or obligations of any kind, and generally all acts heretofore done by said trustees, in the conducting, managing and transacting of the business of the society, and whether done by said trustee or either of them, severally and in his own name as trustee, or jointly in the joint names of himself and his cotrustee.

"Fourth. We do also hereby ratify, approve and confirm the acts of the board of elders in the appointment of Ernest Woelfel, as cotrustee with Jacob Henrici, and declare said Jacob Henrici and Ernest Woelfel, the present board of trustees, authorized and empowered to do, perform and transact any and all business of the society, and to the full extent of the powers and authorities mentioned and designated in and conferred on the board of trustees, in

and by the articles hereinbefore mentioned, made and entered into August 12th, 1847, and recorded as aforesaid.

"In witness whereof we have hereunto set our hands and seals this 30th day of April, A. D. 1890."

[Duly signed and acknowledged.]

Two years later, in December, 1892, a supplementary article was executed by 37 persons declaring themselves to be "the present members of this society and association," and declaring also that "no other person or persons than those above named is a member thereof":

"Whereas, the undersigned, being all the members of the Harmony Society, at Economy, Beaver county, state of Pennsylvania, deem it proper and desirable that there be some suitable, proper and certain evidence of membership in said society, and that the rights and powers of the trustees of said society should be more clearly defined and understood:

"Now, therefore, while we do hereby ratify and confirm the articles of agreement and compacts of our association entered into at Economy on the 12th day of August, 1847, and those of April 30th, 1890, confirmatory of the former and ratifying the acts of the boards of elders and boards of trustees, both of which articles of agreement are recorded in the recorder's office of Beaver county, and are hereby reaffirmed, we and each of us, present members of the said Harmony Society, do hereby state and declare that this declaration, agreement and grant of power is, and is to be taken and considered as supplementary to the agreements, compacts and articles above mentioned, to wit:

"First. The present members of this society and association are Jacob Henrici (and 36 others), and no other person or persons than those above named is a member thereof, and that for the future it is agreed that before any person can become a member of the Harmony Society, he or she shall sign or make his or her mark to his or her name on the roll of membership, which shall always be kept in the record book of the society, which book was established by the aforesaid agreement of 1847, and is the same in which are entered copies of said articles above mentioned; and shall also sign a written agreement in said book binding himself or herself to the observance and performance of all and singular the declarations, stipulations and agreements of the members of the society as contained in the several written articles, and the book aforesaid containing said roll of membership shall be the sole and exclusive proof of membership in the society.

"Second. It is hereby declared and agreed that the present board of elders of said society are Jacob Henrici (and 8 others), and the present board of trustees of said society are Jacob Henrici and John S. Duss. And we do hereby grant and assign to said trustees and their successors, and do hereby agree and declare that the legal title to any and all the property, real and personal, owned or possessed by said society, wherever the same is situated or found, is, and is to be taken and considered as fully vested in the said trustees, Jacob Henrici and John S. Duss, above named, and held by them in trust for the society, but with full and complete power and authority in said trustees, their survivors and successors, at such time or times as they may deem advisable and for the best interests of the society to sell and dispose of the same, or any part or parcel of the same, and for this purpose to make assignments or bills of sale of said property, personal estate and to execute and deliver deeds in fee simple, or for any less estate, for any or all said real estate thus sold. This declaration and power to apply to and embrace any and all lands wherever situated now or hereafter belonging to said Harmony Society, or held in trust for said society, the title of which may be, or stand, in the name of Frederick Rapp, or George Rapp, or of R. L. Baker and Jacob Henrici, trustees; Jacob Henrici and Jonathan Lenz, trustees; Jacob Henrici and Ernest Woelfel, trustees; Jacob Henrici and John D. Duss, trustees, or any or either of them and their successors, and any board of trustees hereafter appointed.

"Third. To remove any possible doubt or misunderstanding as to their right and power in reference thereto, we hereby give and grant to said trustees above named, Jacob Henrici and John S. Duss, and to either of them and

their survivors and successors, full power from time to time, and at such times as they, or either of them may deem for the true interest of the society to borrow such sum or sums of money for such length of time, at such rates of interest and upon such other terms as the said trustees, or either of them or their survivors or successors may deem advisable; and jointly or severally to give notes, bills of exchange, bonds, due bills or other evidence of debt therefor, and to secure such loan or loans of money, bonds, notes, due bills or other evidences of debt by pledge or assignment of any stocks, bonds, or other personal property of any kind now belonging, or that may hereafter belong to said society, and by mortgage or mortgages upon, or deeds of trust of, all or any part of the real estate and leaseholds of real property, which said society now own or possess, or hereafter may own or possess, and for this purpose the said trustees above named, or either of them, their survivors or successors, shall have full power and authority to make, execute and deliver any and all such instruments and conveyances as may in their judgment be reasonably necessary to enable them, or either of them, to carry the foregoing powers into full effect.

"And in the execution of any instruments or conveyances in writing or otherwise that may be or so become reasonably necessary in the exercise or execution of any of the powers hereinbefore granted, either of said trustees, their survivors or successors, may execute the same, and for that purpose may sign the joint names of said trustees, as in the following form: 'Jacob Henrici and John S. Duss, trustees,' or 'Henrici and Duss, trustees,' by (name of trustee executing) 'trustee.'

"In witness whereof, we have hereunto set out hands and seals this ...... day of December, A. D. 1892."

A further supplementary article was executed on February 15, 1897, by the 10 persons who were then "all the members of and constituting the Harmony Society":

"Entered Feb. 15th, 1897.

"Supplementary Articles of Association of the Harmony Society.

"Whereas, since 1847 the board of trustees of the Harmony Society has consisted of two members, and for some time past John S. Duss has been senior trustee and Gottlieb Reithmueller has been junior trustee; and

"Whereas, the said Gottlieb Reithmueller died on the 10th day of February, A. D. 1897, leaving the said John S. Duss as sole surviving trustee:

"Now, we, the undersigned, being all the members of and constituting the Harmony Society, do hereby ratify and confirm our articles of association, dated August 12th, 1847, and also those dated April 30th, 1890, and those dated December 21st, 1892, except that from this date our board of trustees shall consist of one member only, and to the said sole trustee for the time being we do hereby give, grant, convey and confer each and every power, privilege, right and discretion, and also all the property, real, personal and mixed, heretofore given, granted, conveyed to or conferred upon the said board of trustees, or either or both of the said trustees, by the said recited agreements of 1847 and 1890 and 1892, of which in any way whatever may have been obtained, or procured, or purchased by the said trustees, or either of them, while acting in such capacity; such sole trustee shall, however, and he does by the acceptance of the office of trustee, assume the duties, trusts and obligations imposed upon the said board of trustees by the said recited agreements.

"And we do hereby nominate and appoint John S. Duss, our present senior trustee, to be such sole trustee.

"In witness whereof, we have hereunto set our hands and seals this 13th day of February, A. D. 1897."

[Duly signed and acknowledged.]

In April, 1903, only eight persons were left, and on the 16th of that month they signed the following additional articles:

"Whereas, on the 30th day of April, A. D. 1890, the then members of the Harmony Society executed a certain article of agreement of ratification and confirmation, whereby they reaffirmed and readopted the contracts of mem-

bership theretofore existing between said members, and which fixed the rights and duties and obligations of the several members of the said society; and also ratifying and confirming each and every act, matter and thing which had been done and transacted for and on behalf of the said society by its board of elders and by its board of trustees, as the said several boards had from time to time been constituted prior to the said 30th day of April, 1890, which said article of agreement is recorded in the office for recording deeds, etc., in and for the county of Beaver, in Deed Book Vol. 125, page 415; and

"Whereas, subsequently, to wit, on the 13th day of February, A. D. 1897, by reason of divers changes in membership and the deaths of divers members, it became advisable to modify said articles of agreement so that the powers, rights and duties theretofore vested in and exercised and performed by the board of trustees should be vested in a sole trustee, and John S. Duss was duly declared that sole trustee; and

"Whereas, since the execution of the said articles of ratification and confirmation on the 30th day of April, A. D. 1890, the said Harmony Society has been involved in long and serious litigation, which has terminated under a decree of the Supreme Court of the United States in a manner favorable to and upholding the rights of the said society, and during that period, by reason of said litigation and otherwise, it has been necessary for the trustees and trustee to negotiate divers sales of property, real and personal, and purchases thereof, and to borrow divers sums of money and make payment thereof, and to make settlements with divers parties sustaining business relations with said society; and

"Whereas, by reason of death, the membership of said society has been reduced to eight members, viz., Karoline Molt, Katherine Nagel, Johanna Hermansdoerfer, Christina Hall, Barbara Bosch, Franz Gillman, John S. Duss and Susie C. Duss, wherefore it has become advisable to further alter and add to the said articles of agreement; and

"Whereas, there has been read over and fully explained to the Harmony Society, and each of its members, the accounts of the said John S. Duss, as trustee, from the time of his appointment to this date, said accounts showing on their face all the money and property acquired by said Duss, as trustee, and all the moneys and property by him paid out, sold or conveyed, and the purposes for which, in each instance, the same were sold, paid out and conveyed; and there has also been explained and made fully known to us the present financial condition of the said society and what its assets and property consists of, and what its debts and liabilities are:

"Now therefore, be it known to whom it may concern, that we, the undersigned and surviving and present members of the Harmony Society, do severally, and each for himself or herself, covenant, grant and agree to and with the others, and each and all of the others as aforesaid, and signers hereof, and with those who shall become members hereafter, as follows:

"First. We hereby expressly affirm and declare the existence of the Harmony Society as a society.

"Second. We do hereby approve, ratify and confirm each and all of the several articles of agreement and compacts heretofore executed by the members of the Harmony Society, including that executed on the 13th day of February, 1897, excepting the sixth clause of the article of agreement executed on the 9th day of March, A. D. 1827 (the said sixth clause having been annulled and abrogated by an agreement executed on the 31st day of October, 1836), and we do declare that the said several agreements (excepting the said sixth clause) are in full force and effect, and constitute the contract of membership, by which the several rights, duties and obligations of the members of our society are to be determined, except in so far as the said articles are hereinafter modified.

"Third. We do hereby approve, ratify and confirm any and all acts, matters and things done and transacted by the board of elders, as the same has been constituted prior to the date hereof, whether the said board has at any time consisted of the entire number of members fixed by the several articles of agreement hereinabove ratified and confirmed, or of a less number.

"Fourth. We do hereby approve, ratify and confirm each and all of the acts, matters and things done, transacted and performed by the board of trustees,

as the same was constituted prior to the 13th day of February, 1897, and as the same has been constituted since that date, consisting of John S. Duss, as sole trustee, and including herein all matters directly and indirectly connected with the litigation of the society; the settlement of claims against the society; the adjustment and settlement of its several liabilities growing out of any business transaction or business enterprises in which the society has, at any time, been interested. And we further ratify, approve and confirm in every respect all the items and the whole of the said accounts of the said John S. Duss, trustee, and each and every act of his in reference to the assets, property and business of the society.

"Fifth. From and after the execution hereof, the board of elders of the Harmony Society shall consist of two members and their successors, chosen in the manner provided by the articles of agreement hereinbefore ratified and approved, and from and after the date hereof the said board of elders shall be John S. Duss and Franz Gillman.

"In witness whereof, we have hereunto set our hands and seals this 16th day of April, A. D. 1903, as members of and constituting said Harmony Society, and also as the members of and constituting the board of elders of said society."

[Duly signed and acknowledged.]

In May, 1903, four persons remained, and they appointed Susie C. Duss as sole trustee:

"Appointment of Susie C. Duss as sole trustee of the Harmony Society, entered May 18, 1903, in Article Book 17, page 497.

"Whereas, on the 12th day of May, A. D. 1903, John S. Duss, sole trustee of the Harmony Society, at Economy, did resign his trust, which resignation was duly accepted, he having the same day withdrawn from fellowship in said society where upon due consideration, and in pursuance of the power in them vested, the board of elders did constitute and appoint Susie C. Duss the successor in trust of the said John S. Duss, as sole trustee of the said the Harmony Society, at Economy, and it is proper that sufficient evidence of such appointment, and of the acceptance of the trust thereunder, be entered of record in the office of the recorder of deeds in and for said county of Beaver, in which county most of the lands of the said society are situate, and in such other places as the business of said society may require:

"Now therefore, it is hereby witnessed that Franz Gillman and Susie C. Duss, the now members of the board of elders of the Harmony Society, in pursuance of the power in them vested by and under the several agreements and contracts existing between the members of the said society, do hereby make, constitute and appoint Susie C. Duss, a member of said society, and of its board of elders, sole trustee of the said society.

"To have, hold and exercise all the rights and powers conferred and to discharge and perform all and singular the duties imposed upon and required of such sole trustee, in and by the several articles of association, and compacts of the members of said society, as executed and adopted by them, and recorded in the recorder's office of Beaver county.

"And Christina Schoeneman Ball and Barbara Borsch, who, with the said Franz Gillman and Susie C. Duss, are all the now members of said society, and constitute the same, do hereby unite herein for the purpose of signifying their approval of the appointment of the said Susie C. Duss as hereinbefore set forth.

"In witness whereof we have hereunto set our hands and seals this 12th day of May, A. D. 1903."

[Duly signed.]

And finally in December, 1905, the membership having been still further reduced by death, the following agreement was signed by Franz Gillman and Susie C. Duss, the two remaining members:

"Whereas, the Harmony Society has been in existence for a period of about one hundred years, and the members thereof have been, and are now, mutually bound by the covenants and stipulations contained in certain instruments

in writing which have from time to time been executed, ratified, adopted or accepted by the membership of the society and by the undersigned, who are all the present members of the said society, and do constitute the same; and

"Whereas, the undersigned believe it is no longer feasible to continue the society on the basis of the several contracts and agreements under which it has existed, and the parties thereto have determined by their mutual consent to dissolve said society and to cancel, annul, and make void all the several contracts and covenants, whereby they now stand bound to each other as members of said society:

"Now, therefore, be it known that we, the undersigned, being the members of and constituting the Harmony Society, do hereby mutually covenant, grant and agree to and with each other as follows:

"First. Each and all of the mutual bonds, covenants and obligations existing between us by reason of all and every the articles of agreement and compacts which we have heretofore executed, recognized, adopted or accepted, viz., the article of agreement executed at Harmony, Butler county, Pennsylvania, on the fifteenth day of February, 1905, the article of agreement executed at Harmony, in Posey county, Indiana, on the twentieth day of January, 1821, the article of agreement executed at Economy, Beaver county, Pennsylvania, on the ninth day of March, 1827, the article of agreement executed at Economy aforesaid on the twenty-first day of October, 1838, the article of agreement executed at Economy aforesaid on the fourth day of August, 1847, the article of agreement executed at Economy aforesaid on the thirteenth day of April, 1890, the article of agreement executed at Economy aforesaid on the twentieth day of December, 1892, the article of agreement executed at Economy aforesaid on the thirteenth day of February, 1897, the article of agreement executed at Economy aforesaid on the 16th day of April 1903—and each and every article of agreement, covenant or compact mentioned or referred to in any and all of the above mentioned articles of agreement, covenants and compacts, and thereby adopted, ratified, declared or accepted by us, or any of us, are hereby cancelled, annulled, and from henceforth made void and of no effect, and each of the parties hereto doth hereby release, exonerate and discharge each and every of the parties hereto from any and all obligations or requirements created, arising from or existing under the said covenants and agreements, or any of them.

"Second. We hereby agree to divide the property and assets belonging to us, as the Harmony Society and as its members, into equal parts, one part for each of the parties hereto, and we do hereby declare that such division has been made by us at the time of the execution hereof, and that each of us has received and taken unto himself, and into his or her own several possession a full and equal part of the said assets and property.

"In witness whereof, we have hereunto set our hands and seals the 13th day of December, A. D. 1905."

[Acknowledged.]

Gillman was examined briefly as a witness, but he is not a party to the bill.

At the risk of being tedious, we have thought it worth while to set forth these proceedings at length, because they disclose with much clearness the objects, the constitution, and (to some extent) the operations, of the society. Additional light, especially upon the society's operations, may be obtained by examining the reports of several lawsuits in which the community has been involved. We shall not dwell upon them in detail, but it may be convenient to refer to them in passing.

The first case is Schriber v. Rapp, 5 Watts (Pa.) 351, 30 Am. Dec. 327, decided by the Supreme Court of Pennsylvania in October, 1836. The point decided appears in the syllabus:

"An association by which each surrendered his property into one common stock for the mutual benefit of all, during their joint lives, with the right of

survivorship, reserving to each the privilege to secede at any time during his life, is not prohibited by law. And that right of secession is not transmissible to the personal representative of a party to such agreement, so as to enable him to recover the property of his intestate, so put into the common stock."

The agreements of 1805 and 1827 are considered by the court, and the testimony contains some reference to the business enterprises in which the society was then engaged.

The next case is Nachtrieb v. Harmony Settlement, Fed. Cas. No. 10,003, decided in 1855, in which Mr. Justice Grier, sitting at circuit, held that the plaintiff had been unjustly expelled from the society and was entitled to a proportionate share of the common property. The reporter has a good deal to say concerning the history of the society, and the case is of interest for that reason, but the decree was reversed by the Supreme Court (Baker v. Nachtrieb, 60 U. S. [19 How.] 126, 15 L. Ed. 528) on the ground that the defendant's unjust exclusion from the society had not been proved. In the opinion of the Supreme Court, the evidence showed that he had received a sum of money from the society as a donation, and had withdrawn and ceased to be a member.

Then came Speidell v. Henrici, 15 Fed. 753, decided by the Circuit Court in 1883, in which the plaintiff sought to recover the value of his labor during a period of 12 years. But as the period had ended in 1831, when he gave up his membership and withdrew from fellowship, Judges McKennan and Acheson held that his laches for 50 years had barred the claim, and in this conclusion the Supreme Court agreed. (1887), 120 U. S. 377, 7 Sup. Ct. 610, 30 L. Ed. 718. Twelve years later, in 1899, a bill was filed (Schwartz v. Duss. [C. C.] 93 Fed. 528) asking for a distribution of the society's assets among the persons legally entitled thereto; the plaintiffs claiming to be included in the number because they were heirs of persons who had formerly been members and had continued to be members until their voluntary withdrawal or death. Circuit Judge Acheson decided (to quote the syllabus):

"Written agreements, signed by the members of a voluntary society from time to time, which form the constitution of the society, and which provide for the community of property, and that neither a withdrawing member nor the representatives of one deceased shall have any claim on the society or its property on account of the contributions of such member thereto, constitute valid contracts, and no claim so arising is enforceable so long as the society continued in existence."

Holding that the society was still in existence in 1899, he dismissed the bill; his decree being afterwards affirmed by the Court of Appeals (103 Fed. 561, 43 C. C. A. 323), and by the Supreme Court (187 U. S. 8, 23 Sup. Ct. 4, 47 L. Ed. 53). And finally, in the case now before the court, Judge Orr has delivered a careful opinion reported in (D. C.) 197 Fed. 401, in which he holds, inter alia, that:

"* * * The property was held under a joint tenancy with the right of survivorship, and hence the heirs of the founder (have) no standing to assert a dissolution of the society and claim a share of its assets on the theory of a resulting trust."

The opinions delivered in the foregoing cases take more or less note of the nature of the title by which the common property was held for

a century; but we do not feel obliged to examine that subject closely in the pending controversy. We think the dispute now before the court is controlled by other considerations, and we shall confine ourselves to these aspects of the subject; our opinion being that as the present plaintiffs have failed to prove George Rapp's special relation to the society's property, and as they appear to have no title of any kind, the bill cannot be maintained. It is clear that their claim rests upon the proposition that they have succeeded to some kind of property right that remained in George Rapp after he had taken his original part in organizing the society. And they are claiming under him as a "founder" in a special sense—as the chief financial benefactor of a charity that has now ceased to exist. If we assume for the moment that such a property right might exist in a "founder," even in the case of a society such as this—which both parties agree was not a charity at all—we are at once confronted with the failure of the plaintiffs to prove that the right did in fact exist. In other words, they have not proved that he was in fact a "founder," except as he was a guide and leader. If we might indulge in conjecture, we should not think it unreasonable to suppose that George Rapp did contribute some money or other property to the infant enterprise; but this would be conjecture merely, for no evidence of such a contribution is presented, and the matter is therefore left unproved. The agreement of 1836 recites that "all record and memorial of the respective contributions up to" 1818 were deliberately destroyed, and this may account for the lack of evidence on the subject now under examination; but, however it be accounted for, the fact cannot be escaped that we have no knowledge concerning George Rapp's financial contribution. In 1804 while he was in Würtemberg he had "property" amounting to $800, but no one knows what became of it. It was suggested in argument that he might have prepared for the projected enterprise by buying land in Pennsylvania before his associates came over; no doubt this might have happened, and it is also true that he may have had other resources; but there is no evidence that he made the purchase or had the additional means. It is easy to conjecture on either side of the question. For example, it may be equally reasonable to suppose that his prominence and leadership, conspicuous as they evidently were, may have been accepted by his associates as the equivalent of a money contribution; guidance, temporal and spiritual, was certainly as much needed as money; but of course there is no evidence on this point either, and we only suggest it as an illustration of what we might suppose if the need for proof did not hamper us in trying to find the truth. Without multiplying guesses, it is enough to say that we are left wholly in the dark as to the amount, either actual or proportional, that George Rapp may have contributed to put the society into operation; and without evidence upon this subject it seems to us that the case of the plaintiffs lacks the necessary support. How could we possibly determine the rule by which to measure their share in the assets to which they lay claim? Where is the evidence from which we may learn how many persons contributed, and how large was each gift? And how can we discover of what character the contributions were—whether money, or property, or services?

206 F.—39

But there is another reason why the plaintiffs cannot prevail; they have never had a title of any kind. If George Rapp ever owned anything to which they might have succeeded, this something could hardly be described as property at all if it had not been capable of transmission. How indeed do the plaintiffs themselves claim to have acquired it? They have been at pains to prove that they are among George Rapp's next of kin, and this must be because they are compelled to stand upon the proposition that they succeeded to something at his death. And this means that if George Rapp were alive to-day he could successfully make the claim put forward by their bill. If he could do this, he would be obliged to put his case on the ground that he had always owned a contingent interest of some kind, and that this had now ripened into a vested right. But certainly, if he ever had such an interest, the plaintiffs' theory requires us to suppose that it disappeared mysteriously at his death, because it was not capable of being handed on to another person. But unless this interest were capable of being transmitted by the usual methods, it would offer us the spectacle of a peculiar estate indeed—one that is not unfairly described in the defendants' brief as a metaphysical conception, something that the plaintiffs somehow received in 1905 and not before, obtaining it then because of George Rapp's merits, but contending nevertheless that it was something George Rapp in his lifetime never had. We do not find it necessary to decide precisely what kind of a valuable interest George Rapp may have had in the society's property when he died in 1847. If he had any interest at all, we need not discriminate between a resulting trust and a base fee, nor do we need to explore other regions in the law of real property; this much at least seems clear: The interest could only have been contingent, but (if it existed at all) it was real enough to be capable of transfer. Call it what we will—a contingent right, a somnolent capacity, a budding estate, or any other fanciful name—it must at least have been alive at his death if it has developed since into a full-grown right, and if it were alive then we may safely conclude that it did not evade the intestate laws of Pennsylvania. Scheetz v. Fitzwater, 5 Pa. 126, Harris v. McElroy, 45 Pa. 216, Slegel v. Lauer, 148 Pa. 236, 23 Atl. 996, 15 L. R. A. 547. These statutes act upon every property right of every name, nature, and description, and, if this particular possibility was then a part of George Rapp's possessions, it passed at his death to his daughter and his granddaughter as his next of kin, and afterwards to his granddaughter alone; and, as she disposed of it by a last will and testament in which the plaintiffs have no beneficial interest, they cannot maintain the present bill. They must themselves claim under the intestate laws of Pennsylvania as George Rapp's next of kin, but the claim must fail, because they were *not* his next of kin at the time of his death. It was then that his property rights passed—if he had any—and not 60 years afterward.

The decree is affirmed, with costs.